JOHN R. EMERY, FREDERIC W. STEVENS, EUGENE STEVENSON, LINDLEY M. GARRISON, EDMUND B. LEAMING, JAMES E. HOWELL AND EDWIN R. WALKER, VICE-CHANCELLORS.

---

ALBERT S. BIGELOW

*v.*

OLD DOMINION COPPER MINING AND SMELTING COMPANY.

[Decided August 8th, 1908.]

1. The power of a court of equity in one state to restrain persons within the control of its process from the prosecution of suits in other states is clear, but upon grounds of comity it should be sparingly exercised.

457

2. The general rule is that as between courts otherwise equally entitled to entertain jurisdiction, that court which first obtains possession of a controversy should be allowed to proceed and dispose of it without interference.

3. This court will not enjoin a suitor from the prosecution of an equitable action already pending in a court of full equity jurisdiction in a sister state upon any theory that this court can better weigh evidence or more justly apply any general principle of law or of equity; nor upon the ground that this court recognizes different rules of law or equity from those which obtain in the sister state.

4. Where a party oppresses his adversary by suing him in a foreign jurisdiction for the purpose of evading some established local policy of the jurisdiction where the parties are domiciled, equity will, in a proper case and upon proper terms, restrain the prosecution of such action.

5. Upon a bill filed here by a citizen and resident of Massachusetts against a corporation organized under the law of New Jersey, seeking to restrain the company from further prosecuting certain equitable actions previously commenced against him in the supreme judicial court of Massachusetts, a court of full equity jurisdiction—*Held,* that the bill here cannot be sustained upon a mere showing (if it were shown) that the cause of action asserted in Massachusetts is unconscionable, or that the company is estopped from maintaining its actions there; the Massachusetts court being a court of conscience, and existing for the very purpose of passing upon the question whether claims and defences are conscionable or unconscionable.

6. In this state the English statutes of champerty and maintenance are not in force.

7. The law of this state does not prohibit a corporation from assigning its right to recover moneys claimed to be due from promoters for undisclosed profits.

8. In this state assignments of contingent and expectant interests are recognized in equity, provided they be made *bona fide* and for a valuable consideration.

9. There is nothing in the law or policy of New Jersey to prevent stockholders from agreeing among themselves to aid their corporation in proper ways in its litigations against third parties, and to use their influence as stockholders to see that out of the proceeds of the litigation, if successful, the reasonable disbursements made by the stockholders in the company's behalf shall be refunded, and a special dividend made of the net proceeds if and when that can lawfully be done.

10. Such an agreement, even were it contrary to public policy, would not operate to discharge third parties from their existing liability to the company.

11. The defendant, a corporation of New Jersey, having instituted equitable actions in the supreme judicial court of Massachusetts against complainant, a citizen and resident of that state, for the recovery of alleged undisclosed promoter's profits, complainant having answered there upon the merits, and the cause having proceeded to hearing and resulted in a finding of facts adverse to him, upon which money decrees were

entered, and both parties having then appealed to the full bench of said court, which is the court of last resort in the commonwealth, the complainant in this juncture filed a bill against the corporation in this court alleging that in truth there was no undisclosed profit received by him in the transactions complained of in Massachusetts.—*Held* (there being no suggestion that the Massachusetts court has not complete jurisdiction over his person and over the subject-matter, that it lacks the power to do full and complete justice in the premises, or that the company has obstructed him about producing his evidence), that complainant's plain remedy is to prosecute his appeal before the court of last resort of the commonwealth, and thus procure a reversal of the findings that have been unjustly rendered against him.

12. Equitable actions in Massachusetts having been commenced by defendant company against complainant more than five years before the filing of his bill of complaint herein, and he having there filed answers setting up, or having opportunity to set up, every matter of fact as to the transactions between him and the company that is alleged in his present bill, and having submitted to a hearing there upon the merits, and the facts having been found against him, and he coming thereafter to this court for an injunction against the further prosecution of the Massachusetts actions—*Held,* complainant is estopped by delay and acquiescence from here setting up that the truth is contrary to the findings in Massachusetts.

13. Assuming the facts to be that promoters of a New Jersey corporation, while acting in a fiduciary capacity to the company, being in control of its board of directors, and owing to the company the duty of full disclosure, made over to it certain mining properties at an excessive valuation, receiving in exchange shares of its capital stock whose par value was largely in excess of the actual value of the property, whereby the promoters acquired a large secret profit for themselves—*Held,* that there is nothing in the law or policy of New Jersey to prevent the company from maintaining an action in equity against one of the promoters in the state of his residence to recover the secret profit.

14. Where a secret profit was acquired jointly by two promoters as the result of a scheme in which they acted in concert, each doing his part to carry it out for the advantage of both, their control of the company from which the fiduciary duty arose being a joint control, exercised by each for the benefit of both, and where a proper disclosure of the facts by either would have frustrated the schemes of both—*Held,* that there is nothing in the law or policy of the state of New Jersey to prevent the company from holding them liable, jointly and severally, and recovering the entire secret profit from either promoter, the other being without the jurisdiction. *Woodbury Heights Land Co.* v. *Loudenslager,* 58 *N. J. Eq.* (*13 Dick.*) *556,* distinguished.—*Held, further,* that if by the law of New Jersey there could not be a recovery of the entire secret profit from one of several joint promoters who acted in combination in acquiring the profit, if the action were brought in this state, it is yet not unconscionable for the company defrauded to insist in an equitable action brought in the home jurisdiction of one of the promoters that he is

responsible for the entire loss; and, if the claim is unconscionable, it is for the court in which the action is brought to so decide.

15. The doctrine of promoter's liability for undisclosed profit arises from the application to special circumstances of the general principles of equity bearing upon relations of trust and confidence. There is nothing in the law or policy of New Jersey requiring that the liability of a promoter to a corporation organized under the laws of this state is to be determined by the law of this state rather than by the law of the state where the transaction occurred or where the action is tried.

16. The public policy of New Jersey is the creature not of the courts, but of the legislature; the courts have nothing to do with forming it, and can only recognize it like any other matter of public law. Where questions of New Jersey law are involved in actions pending in other states, it is proper for the litigant to set them up and prove them in the state where the action is pending.

17. The general rule that a party seeking relief in the courts may choose his own forum in any jurisdiction where the defendant may be found, is not limited to plaintiffs who are natural persons. The New Jersey Corporation act of 1875 (*Rev. 1877 p. 175 § 1*) conferred upon corporations organized thereunder the right to sue and complain in any court of law or equity.

18. The fact that the federal courts entertain a different view upon the law pertinent to the controversy from that held by the courts of Massachusetts, where the controversy is pending, does not justify the court of chancery of New Jersey in restraining a corporation of this state from the prosecution of its actions in Massachusetts against a resident and citizen of that state.

19. Equity does not recognize any right of contribution between joint trustees who are together guilty of intentional wrong-doing in respect of the trust.

20. Where the ground of the joint liability for which complainant is held answerable *in solido* in Massachusetts is that he and his fellow promoter together gained a secret profit from a New Jersey corporation, and it appears that as a part of the same transaction, and as the very means adopted to accomplish their common purpose, the promoters procured the issuance by the New Jersey company of a large amount of its capital stock which had no value behind it, in violation of the letter and policy of the corporation act of this state—*Held*, that the courts of New Jersey will not aid one of the joint promoters in recovering contribution from the estate of his fellow promoter.

21. Defendant's actions against complainant in the Massachusetts court having been commenced more than five years before the filing of his bill of complaint in this court, and he having answered upon the merits in Massachusetts when he was in full possession (or with reasonable diligence might have been) of every fact and of every ground of argument upon which he relies in this court for an injunction to restrain the prosecution of the Massachusetts actions; and he having in the meantime acquiesced in the jurisdiction of the Massachusetts court and sought to take a benefit from it in the form of a decree there that, if it

had proved to be favorable to him, would have concluded the company. and having come here only after a decision against him upon the merits, and there being no suggestion that his delay in coming to New Jersey for relief was due to accident or inadvertence—*Held*, that by laches, acquiescence and waiver, complainant has lost any right he might otherwise have had to obtain from this court an injunction to restrain the defendant from the further prosecution of the Massachusetts actions.

On motion to dismiss bill of complaint.

*Mr. Bennet Van Syckel* and *Mr. John Griffin,* with whom were *Mr. Charles H. Tyler* (of the Massachusetts bar), and *Mr. John C. Spooner* and *Mr. James L. Bishop* (of the New York bar), for the complainant.

*Mr. Gilbert Collins, Mr. Charles L. Corbin* and *Mr. William H. Corbin,* with whom were *Mr. Louis (B) Brandeis* and *Mr. Edward F. McClennen* (of the Massachusetts bar), for the defendant.

PITNEY, CHANCELLOR.

This is a motion, made under rule 213, to strike out and dismiss the bill of complaint upon grounds that may be summarized thus: (*a*) want of equity, (*b*) *res adjudicata,* (*c*) laches.

The general object of the bill is to restrain the defendant, a corporation of the State of New Jersey, from prosecuting two actions in equity heretofore brought by it against the complainant, a resident and citizen of Massachusetts, in the supreme judicial court of that commonwealth, in which the complainant has answered and a hearing has been had upon the merits, resulting in certain findings of facts upon which money decrees have been entered against him, and from these decrees both parties have appealed to the full bench of the supreme judicial court, which is the court of last resort in the commonwealth.

Upon the filing of the present bill, and before the making of this motion, the bill, with accompanying affidavits, was presented to Vice-Chancellor Walker upon an application for a temporary injunction. After hearing argument, the vice-chancellor, without undertaking to decide the merits, but leaving the

questions involved to be deliberately decided upon full hearing, held that a case was made which should move this court to grant a preliminary injunction and thus preserve the status. The injunction accordingly issued.

The present motion is in effect a demurrer to the bill, and affords a proper opportunity to deliberately determine the merits. *Grey* v. *Greenville and Hudson Railway Co.,* 59 *N. J. Eq.* (14 *Dick.*) 372, 377; *Stevenson* v. *Morgan,* 63 *N. J. Eq.* (18 *Dick.*) 707. Vice-Chancellor Walker sat with me upon the argument, and has received and considered copies of the very elaborate and voluminous printed arguments that were submitted to me. I have had the benefit of conferences with him before reaching a conclusion, and he concurs in the result now reached and in the grounds of decision.

Shortly stated, the object of the Massachusetts actions is to recover certain large profits (aggregating, with interest, about $2,000,000) alleged to have been secretly and improperly acquired from the company by Mr. Bigelow and one Leonard Lewisohn, since deceased, who resided in the State of New York, while they were jointly acting as promoters and fiduciary agents of the defendant company.

Manifestly, the only ground upon which this court can properly be asked to restrain these actions must be that the defendant is acting contrary to equity and good conscience in prosecuting them.

The present bill first sets forth what complainant avers to be the true history of the matters out of which the Massachusetts litigation arises. It then sets out the actions instituted against him by defendant company in Massachusetts, shows that afterwards similar actions were instituted against the executors of Lewisohn in the circuit court of the United States for the southern district of New York, and gives the history of these litigations. Copies of the record in the Massachusetts suits are annexed to the bill as part thereof, and we are thus informed of the facts alleged by the present defendant against Bigelow, the findings of fact of Justice Sheldon, before whom the actions were tried, the decrees thereupon made against Bigelow, and the grounds of the appeals taken by the present defendant from

those decrees to the court of last resort. The present complainant has likewise appealed, upon what grounds does not appear.

It is clear that the fate of the present bill must depend not upon the question which party has the right of the controversy pending in Massachusetts, but upon the question whether there is any sufficient occasion for this court to interfere in that controversy. For this reason, in summarizing the historical statement contained in the bill, I shall endeavor to place in juxtaposition what the present defendant has alleged in the Massachusetts actions concerning the same transactions, and what Mr. Justice Sheldon has found the facts to be.

The present bill alleges that in the spring and early summer of the year 1895 Mr. Bigelow, acting in conjunction with Leonard Lewisohn, of the city of New York, procured options, one from the Simpson estate (of Boston), and one from a Mr. Keyser (of Baltimore) for the purchase of all the capital stock of a Maryland corporation known as the Old Dominion Copper Company of Baltimore City (otherwise referred to as the Baltimore company). This company was the owner of mines and mining claims in Arizona. The par value of its stock was $500,000; the purchase price was $1,000,000. By agreement between Bigelow and Lewisohn, their interests in the several stock purchases were so arranged that, as between themselves, the former was to have twenty-three forty-seconds and the latter nineteen forty-seconds of the benefit of the entire purchase. The purchase was completed on or about June 20th, and the control of the Baltimore company was turned over to Bigelow and Lewisohn on that day, a new board of directors being chosen in their interest, of which they were members. Meanwhile, having ascertained that Keyser held the legal title to four mining claims and a certain parcel of land in Arizona (which may for convenience be called the "outside properties") in trust for the Baltimore company, Bigelow and Lewisohn insisted that these properties should follow the ownership of the stock. This was assented to by Keyser, the Simpson executors and the Baltimore company, and for this purpose Keyser subsequently made a deed conveying the "outside properties" to Lewisohn (but,

of course, in trust for the parties entitled to the stock of the Baltimore company).

The narrative portion of the bill, without expressly alleging the fact, leaves it to be understood that the price of the Simpson and Keyser stock was paid by Bigelow and Lewisohn with their own funds, and that the purchase was made for their sole benefit.

In the Massachusetts suits, however, the present defendant averred in its bills of complaint that the purchase was made with moneys subscribed and contributed by a syndicate organized for the purpose by Bigelow, either alone or in conjunction with Lewisohn; that it was known as the "Old Dominion Syndicate," and contributed approximately $1,000,000 to purchase the Baltimore stock. Bigelow's answers in Massachusetts admit such a syndicate was formed about May 24th, 1895, and afterwards enlarged, but aver that it was the understanding and agreement of all parties that Bigelow and Lewisohn, having purchased and paid for the shares of the Baltimore company with the money thus subscribed, and holding them in their own names, should deal with them as to them should seem best,

"and that the associates in the syndicate should receive so much only of the profit realized in the enterprise as Bigelow might deem it fair and proper to distribute among them, and that the remaining profit should be retained by Bigelow to his own use."

This statement as to the understanding with the syndicate members is negatived by the findings of Mr. Justice Sheldon, as will appear hereafter.

The bill herein avers that at the time they acquired the stock of the Baltimore company, and obtained control of that company, Bigelow and Lewisohn had no definite plan with respect to the disposition thereof, and that it was not until afterwards that the formation of a new company was determined upon. (This is negatived by the findings, as appears below.) That thereafter they determined to form a New Jersey corporation with a capitalization of $3,750,000 divided into one hundred and fifty thousand shares of the par value of $25 each, and convey to it all the property of the Baltimore company and the "outside

properties," and furnish $500,000 for working capital in return for all the capital stock of the new company. That the details of the organization and the carrying out of these plans were left to counsel, and resulted in the formation on July 8th, 1895, of the New Jersey corporation, defendant herein. That this company held its first meeting on the following day and elected a board of directors, and two days later several of these resigned and others (including the two promoters) were selected in their places. That thereafter it was agreed between the promoters and the defendant company that they should convey to it all the property of the Baltimore company, including the "outside properties," and should furnish the new company with a working capital of $500,000 in cash, in consideration whereof the new company should issue to them or their nominees, and to the nominees of the Baltimore company (of which they owned the entire capital stock), the entire capital of the new company, consisting of one hundred and fifty thousand shares. That this was carried out in substance as a single transaction, although in form there were two transactions, one being the sale by the Baltimore company of all its property, except cash assets, to the new company for one hundred thousand shares of the stock of the latter, and the other being in form a sale by Lewisohn to the new company of the "outside properties" for thirty thousand shares of its stock. That the conveyances were subsequently made accordingly, and the obligation to furnish $500,000 of working capital having been performed, the defendant company issued one hundred and fifty thousand shares of its capital stock. That the stock was issued as follows: One hundred thousand shares to one Dumaresq, nominally on account of the property standing in the name of the Baltimore company; thirty thousand shares to Bigelow and Lewisohn, nominally on account of the "outside properties," and twenty thousand shares to one Nelson, nominally on account of the working capital of $500,000, which sum, as the bill alleges, was actually procured by Bigelow and Lewisohn through the sale of stock to their friends.

In the Massachusetts actions it is charged by the company that the twenty thousand shares that were placed in Nelson's name were sold to the public for working capital by the company

itself, and not by the two promoters, and so Justice Sheldon finds.

The bill sets up that the property turned over to the new company (defendant herein) by the promoters and by the Baltimore company (of which they were in full control) was worth fully as much as $3,250,000, the par value of the one hundred and thirty thousand shares of stock of the new company taken in exchange therefor.

The bills filed by the present defendant in the Massachusetts actions charge, in effect, that the property that stood in the name of the Baltimore company was worth no more than the price paid for the stock of that company by the promoters and their syndicate, and that the "outside properties" were worth not more than $5,000. Justice Sheldon finds the intrinsic value of the property held in the name of the Baltimore company was not more than $1,000,000, but that its market value at the time of transfer to the new company was seemingly greater than this, "probably due in large part to the skillful manipulations of Bigelow and Lewisohn, and the ingenious manner in which they created a desire on the part of men interested in mines, as investors or speculators, to be allowed to join in the transaction they were carrying out. This market value, however, was less than $2,000,000." He finds that the market value of the "outside properties" was not exceeding $50,000.

The bill herein avers that the holders and owners of the entire authorized capital stock of defendant company procured and consented to the issue of its entire capital for the consideration above mentioned, and no person who was a stockholder at the time of the consummation of the transaction objected; that subsequent shareholders acquired their shares not from the company, but from Bigelow and Lewisohn.

As already observed, the Massachusetts bills allege, and Justice Sheldon finds, that twenty thousand shares (par $500,000) were sold for working capital by the company itself, and not by Bigelow and Lewisohn. Besides, these bills allege that during the entire course of the transactions in question, Bigelow and Lewisohn were promoters of the defendant company, and were in complete control of its organization, a large majority of the

directors being interested with Bigelow in the transactions and receiving some share in the profits, and the remaining directors taking no active part in the management and being ignorant of the facts, and allege that no disclosure was at any time made of the promoters' profit. The bills allege further that the organization of the new company was determined upon as early as March, 1895, when the promoters began to acquire the stock of the Baltimore company, it being a part of their plan that they should sell the property of that company to the new company at a large advance in price, to the injury of future stockholders therein, and that they should thereby secure for themselves as promoters and organizers a large secret profit, and that all the subsequent transactions were in pursuance of this plan; that the two promoters took for themselves the entire thirty thousand shares issued for the outside properties, and that of the one hundred thousand shares issued for the property standing in the name of the Baltimore company, they divided among the members of the syndicate only eighty thousand shares, par $2,000,-000, and took for themselves the remaining twenty thousand shares, par $500,000, ostensibly in payment for their expenses and services; that no disclosure was made to the members of the syndicate, other than themselves, of the profit acquired by Bigelow and Lewisohn, and that the company had no knowledge of any of the promoters' profits until the year 1902, shortly before the actions were brought.

Mr. Justice Sheldon's findings are substantially in accord with these contentions. He finds that Bigelow and Lewisohn were promoters of the new company and in full control of it during all the transactions in question, and dictated whatever was done by the company or in its behalf; that this control continued until April, 1902; that the company had no directors, representatives or advisers other than the two promoters and their agents, and that they did not disclose to the company any of the pertinent facts; that they did not disclose to it that they had paid only $1,000,000 for the stock representing all the mining property of the Baltimore company, or that they procured the "outside properties" without any other consideration. Nor did they see that the new company had any independent advice

before accepting the offers made to it, which were really made
by themselves. On the contrary, they organized and promoted
the new company for the purpose of having it accept, and they
exercised their control over it to cause it to accept said offers,
and really through their own action and that of their employes
themselves accepted said offers in the name of the company.

Justice Sheldon also finds that Bigelow did not act towards
the members of his syndicate with good faith; that when the
scheme was formed it was the plan and avowed intention of
the two promoters to form a new corporation with a capital
stock of $2,500,000, which should take the property of the Balti-
more company and the "outside properties" for $2,000,000, and
raise $500,000 of working capital with the rest of its stock;
this would give to Bigelow stock for the money raised and ap-
plied by him at the rate of just $2 for $1, and he expected and
stated to the various members of the syndicate that he expected
to give to each subscriber thereto cash to the full amount of his
subscription and stock at par to the same amount, the cash to
be raised by selling the surplus stock, which would produce just
that amount. The promoters proceeded, however, to organize
the new company under the laws of New Jersey with a capital
stock of $3,750,000, being one hundred and fifty thousand
shares of the par value of $25 each; that the result of his and
Lewisohn's transactions with the new company was that for the
$1,000,000 of their own and their associates' money which they
invested, they received, subject to the payment of legitimate ex-
penses not exceeding $20,000, stock to the par value of $3,250,-
000; that Bigelow gave to the members of his syndicate only
$2 for $1, either wholly in stock, or half in cash and half in
stock, as they elected, and that with a few individual exceptions
he did not disclose the facts to them. That the great majority
of the members of his syndicate did not become aware of the de-
tails of what was done by Bigelow and Lewisohn, but accepted
the allotment of $2 for $1 in cash or in stock for the several
investments that they had made, and contented themselves, in
their ignorance, with the fact that they had doubled their
money; that the residue of the gain received by Bigelow he
dealt with as he chose. Justice Sheldon distinctly finds that it

was not the fact, as alleged by Bigelow in his answers, that it was the understanding among the associates in the syndicate that Bigelow and Lewisohn should deal with the shares as to them should seem best, and that the associates should receive so much only of the profit realized in the enterprise as Bigelow should deem it fair and proper to distribute among them, and that the remaining profit should be retained by Bigelow to his own use.

The learned justice further distinctly negatives the contention of Mr. Bigelow that it was the intention that he and Lewisohn should supply the new company with $500,000 for working capital; that this was actually done; that Bigelow and Lewisohn themselves took the twenty thousand shares which were to be used for raising the working capital, and that the parties who afterwards subscribed for and received these shares really took them from Bigelow and Lewisohn, and not from the new company, and that at the time of the transactions in question Bigelow and Lewisohn became and were the real owners of all the authorized capital stock of the new company. The justice says: "There was some evidence in support of this contention, but I find that the real facts are as already stated."

The bill herein avers that the transactions concerning the purchase of the property in question by the company and the issuance of stock therefor, were ratified by the stockholders at three different meetings held in the years 1899 and 1901, when neither Bigelow nor Lewisohn controlled the company or the action of its stockholders.

The company, in the Massachusetts action, denied all knowledge on the part of the company until after April 4th, 1902, until which time Bigelow and Lewisohn were in complete control. Justice Sheldon so finds, and further finds specifically the facts and circumstances respecting the so-called ratification by the stockholders' meetings, from which the inference is that the supposed ratifications were of no effect as against the company.

The bill then sets up that on October 7th, 1902, the present defendant commenced two separate actions in equity against Mr. Bigelow in the supreme judicial court of Suffolk county, in Massachusetts, one relating to the transaction in which thirty thousand shares of stock were acquired by Bigelow and Lewisohn

in exchange for the "outside properties," as to which rescission and return of the stock were prayed, and in the alternative that the damages sustained by the company should be ascertained and Bigelow required to pay them, and for other and general relief; and the other suit relating to the transaction in which one hundred thousand shares were issued in exchange for the properties standing in the name of the Baltimore company, as to which the prayer was that Bigelow should be required to account for so many of these shares as were received by Bigelow and Lewisohn, or by any other person, as profit in connection with the promotion and organization of the company, or that the damages suffered by the company should be ascertained and Bigelow required to pay them, and for other and general relief.

The bill avers that Bigelow filed a demurrer in the thirty-thousand-share suit, and answered in the one-hundred-thousand-share suit. That the demurrer was overruled (*188 Mass. 315; 74 N. E. Rep. 653*), and Bigelow then answered in this suit. That the causes proceeded to trial, being heard together before Justice Sheldon of the supreme judicial court; that he decided them in favor of the company and against Bigelow, *rendering judgment in the one-hundred-thousand-share suit* for about $800,000, principal and interest, and in the thirty-thousand-share suit for about $1,200,000. That decrees were accordingly entered, from which appeals were taken by both parties.

As already mentioned, copies of the bills and answers in the Massachusetts suits, and the other documents forming the record thereof, including the findings, are annexed to the present bill as part thereof, and are referred to in the bill as thus annexed.

The bill sets up that after the commencement of the Massachusetts suits against Bigelow the defendant company began two suits in equity in the circuit court of the United States for the southern district of New York against the executors of Leonard Lewisohn, who was then deceased; that the bills in these two suits were identical with those filed in Massachusetts, and were founded upon the same state of facts. That the executors demurred in one case and answered in the other. That the demurrer to the bill in the thirty-thousand-share suit was sustained by Judge Lacombe (*136 Fed. Rep. 915*) and a final decree was

entered dismissing the bill; from this decree the company appealed to the United States circuit court of appeals, and that court affirmed the decree of the court below in sustaining the demurrer (*148 Fed. Rep. 1020*); that thereupon the company applied to the supreme court of the United States for a writ of *certiorari* to review this decision, and that such writ was allowed. So far as appears the other Lewisohn suit is pending undetermined.

The bill contains certain further averments intended to show grounds for the intervention of this court in the Massachusetts litigation.   Mention of these may be reserved until they are reached in their order for discussion.

To complete the recital it should be shown at this point upon what basis Justice Sheldon made up the amounts for which he ordered decrees to be entered against Bigelow.   He found that the stock which the promoters took as their profit "was then of fully its par value, due mainly to the skillful conduct and manipulation of Bigelow and Lewisohn, and continued to be so for some time, and until Bigelow had sold out substantially all the stock that he took for his own use."

Having ascertained that out of the one hundred thousand shares (par $2,500,000) that were issued in payment for the property standing in the name of the Baltimore company, the promoters took for themselves twenty thousand shares (par $500,000) without disclosure either to the company or even to the syndicate associates, and that the market value of these shares was equivalent to par.in the market created by the manipulations of the promoters, and having found also that in truth the property of the Baltimore company was worth .not more than $2,000,000 (or eighty thousand shares at par), which happens to be the exact price at which the associates in the syndicate understood that it was to be valued, Mr. Justice Sheldon charges the promoters, in one of the actions, with $500,000 secret profit, less $20,000 allowed for legitimate expenses of promotion, and for the difference, $480,000, with interest from the time the promoters received the stock, a decree was entered.

In the other action, wherein the company prayed primarily for rescission of the transaction that resulted in the issuance of

thirty thousand shares to Bigelow and Lewisohn for the "outside properties," Justice Sheldon held, in favor of Bigelow, that the situation of the parties had so far changed that rescission should not be granted, because while the properties themselves were in the same condition as when conveyed to the company, Bigelow had disposed of his stock before the suit was brought, had not the thirty thousand shares to surrender, and apparently could not procure them in the open market, and because, also, the company had, since the transaction in question, increased its capital stock and bought new and additional mines, whose value and profitableness was not shown. He therefore charged the promoters with $750,000, the market value of the thirty thousand shares at the time they received them and for some time thereafter, against which was credited $50,000, the utmost value of the "outside properties," leaving $700,000 and interest as the amount of this decree.

Upon the findings Bigelow would have been liable for only about twenty-three forty-seconds of the award, had he been charged with only his share of the profit according to the division made between him and Lewisohn. But Justice Sheldon found that in the formation and execution of the scheme the two promoters were acting together and in concert, each doing his part to carry out a joint scheme for the advantage of both; that the control exercised by them over the company was a joint control, exercised by each for the benefit of both; that a proper disclosure of the real facts by either would have frustrated the schemes of both, and that the equitable tort complained of was the act of both, for which they must be held responsible both jointly and severally. He therefore held Bigelow liable *in solido.*

Appeals have been taken by both parties to the full bench of the supreme judicial court of Massachusetts, the court of last resort in the commonwealth, which appeals, according to the averments of the bill, have the effect of not merely suspending, but of vacating the decrees; but the findings of Justice Sheldon upon the facts will not be overruled by the full bench unless they are without support in the evidence or are clearly contrary to the weight of the evidence. The full bench has original as well as

appellate jurisdiction, and may order a new trial or further pro-ceedings at the bar of the court. The evidence that was before Justice Sheldon is not made a part of the present bill.

Enough has been said of this somewhat complicated trans-action to introduce the discussion that follows. Other allega-tions and findings may be referred to as occasion requires.

I have not the least doubt or difficulty about the power of a court of equity in one state to restrain its own citizens, or other persons within the control of its process, from the prosecution of suits in other states or in foreign countries. The power pro-ceeds from the undoubted authority that a court of equity pos-sesses over persons within its jurisdiction to restrain them from doing anything that is contrary to equity and good conscience, to the wrong and injury of others, whether the threatened in-equitable conduct consists in the prosecution of an action or whatever it may happen to be.

The court of equity thus appealed to, acts *in personam,* and it is immaterial whether the threatened inequitable conduct is to be carried on within or without the limits of the jurisdiction. *1 High Inj.* § *103; Story Eq. Jur. (12th ed.)* §§ *899, 900; Margarum* v. *Moon, 63 N. J. Eq. (18 Dick.) 586,* and cases cited.

But on general principles, equity will not interfere with the right of any person to bring an action for the redress of griev-ances—the right preservative of all rights—except for grave rea-sons, and on grounds of comity the power of one state to interfere with a litigant who is in due course pursuing his rights and remedies in the courts of another state ought to be sparingly exercised. The courts of New Jersey ought not to assume, di-rectly or by indirection, any appellate jurisdiction over the courts of Massachusetts, nor proceed in giving judgment here upon the idea that the courts of that commonwealth are in the least degree incompetent or unwilling to do full and complete justice in all cases that are fairly within their jurisdiction.

It is averred in the bill that the actions now pending before the supreme judicial court of Massachusetts are equitable ac-tions. It is by implication admitted in the bill, and was most fully admitted in argument, that that court has the amplest equity powers, and it is equally clear that the causes there pend-

ing are, with respect both to subject-matter and to parties, within its jurisdiction.

They must be very special circumstances that will justify this court in restraining the prosecution of an equitable action already pending in a court of such ample jurisdiction. I speak not of any limitation upon the power of this court, but upon the *propriety* of its exercise in the particular case. Its exercise is not to be properly based upon any theory that this court knows better how to do justice than the court of last resort of that commonwealth; that it can weigh evidence better or more justly apply to the facts any general principle of law or of equity, nor upon the ground that this court recognizes different rules of law or of equity from those which obtain in the commonwealth.

A condition precedent to an application to this court for relief in all ordinary cases is the absence of a full, adequate and complete remedy elsewhere.

And besides, there is the general rule, essential to the orderly administration of justice, that as between courts otherwise equally entitled to entertain jurisdiction, that court which first obtains possession of the controversy ought to be allowed to proceed and dispose of it without interference, a rule established, of course, primarily for the benefit of the suitor, rather than for the protection of the dignity of the court. It was applied by Chancellor Runyon in *Home Insurance Co.* v. *Howell, 24 N. J. Eq. (9 C. E. Gr.) 238, 241,* where suit having first been commenced in this court for relief against certain policies of insurance alleged to have been fraudulently obtained from the complainant upon defendant's property in Illinois, and defendant having afterwards begun suit upon the policies in a court of that state, which suit had been removed to the federal court, the learned chancellor allowed an injunction against the prosecution of this action, notwithstanding the insurance company might have had complete relief in the federal court either at law or by recourse to its equity side. In his opinion he quoted with approval the remark of Justice Grier in *Peck* v. *Jenness, 7 How. (U. S.) 625,* to the effect that the rule giving exclusive jurisdiction to the court which first obtains possession of the controversy has its foundation not merely in comity, but in necessity;

"For if one may enjoin the other may retort by injunction, and thus the parties be without remedy, being liable to a process for contempt in one if they dare to proceed in the other," a remark reiterated by the supreme court of the United States in *Central National Bank* v. *Stevens, 169 U. S. 459.*

In *Title Guarantee and Trust Co.* v. *Trenton Potteries Co., 56 N. J. Eq. (11 Dick.) 441,* the potteries company having commenced an action at law in the New York supreme court upon a policy of insurance issued to it by the title company, the latter company afterwards filed its bill in this court alleging a mistake in the policy, and praying that it might be reformed, and that the potteries company might be restrained from further prosecuting the New York action, on the ground that if it were permitted to do so before the policy was reformed in such manner as to set out the true agreement of the parties, a judgment would necessarily go against the title company. This court allowed a preliminary injunction, whereupon the potteries company filed its answer setting up that under New York law the title company was entitled to there plead its equitable defence. Upon this answer, and affidavits verifying it, the injunction was dissolved. Upon appeal, the court of errors and appeals affirmed this decision, Mr. Justice Gummere (now chief-justice) saying: "The respondent having selected a court of the domicile of the appellant as the forum in which to try the matters in issue between them involved in the suit brought by it, is entitled to have those matters finally determined in that forum, provided the appellant can in its defence in that suit show the real agreement between the parties as fully as it would be permitted to do in its suit brought here for the reformation of the written contract."

In *Sweeny* v. *Williams, 36 N. J. Eq. (9 Stew.) 627, 629,* Mr. Justice Magie (afterwards chancellor), speaking for the court of errors and appeals, said: "If there exist a concurrent jurisdiction in courts of law and courts of equity, the latter will decline to entertain jurisdiction after the jurisdiction of the courts of law has attached, unless the relief that the applying party is entitled to ask cannot be fully obtained in the court of law." See, also, *New Jersey Zinc Co.* v. *Franklin Iron Co., 29 N. J. Eq. (2 Stew.) 422, 430; Minchin* v. *Second National Bank,*

*36 N. J. Eq. (9 Stew.) 436, 443; Shaw* v. *Frey, 69 N. J. Eq. (3 Robb.) 321, 323.*

I am referred to *Dchon* v. *Foster, 4 Allen 545; 7 Allen 57;* and *Cunningham* v. *Butler, 142 Mass. 47; Cole* v. *Cunningham, 133 U. S. 107.* These decisions were based upon the ground of a threatened evasion of the essential features of a local insolvent law. They will be further mentioned in their proper order below. But in *Carson* v. *Dunham (1889), 149 Mass. 52; 20 N. E. Rep. 312,* it was held that their authority did not support an application for an injunction on the ground of conflicting decisions or diversity of law. The latter case was an application for an injunction to restrain the defendant, a citizen of Massachusetts, from prosecuting against another citizen of the same commonwealth a foreclosure suit in a South Carolina court concerning land situate in that state. It appeared that there was a difference of opinion between the supreme court of the United States and the supreme court of South Carolina upon the merits of the controversy. Chief-Justice Morton said *(149 Mass. 56; 20 N. E. Rep. 314)* : "We are then brought to the question whether the fact, if it be a fact, that the supreme court of South Carolina entertains views of the law which govern the rights of the parties differing from those held by the supreme court of the United States, justifies us in restraining Dunham from the further prosecution of the suit in the state court. The law gives the parties a choice of tribunals. Why is not Dunham's right to choose the South Carolina court as great as the right of Mrs. Carson to choose the United States court or the courts of this commonwealth? Reduced to its elements, the argument of the plaintiff is that we should interfere because there is danger that the supreme court of South Carolina will not rightly and justly decide the rights of the parties. We cannot yield to such an argument without a violation of every principle of interstate comity. As we have said, the general rule of comity is that the court first acquiring jurisdiction shall retain it. In our judgment, it would be indefensible for the courts of this commonwealth to restrain the prosecution of a suit pending in the court of a sister state, which has jurisdiction of the subject-matter and of the parties, upon the ground that the decision of that court

may differ from our own opinion, or from the decisions of other courts of equal authority. All the facts presented to us can be and are presented in the case pending in South Carolina, and it is presumed that the supreme court of that state will decide the case according to the law and the right."

The court of appeals of New York has even refused to interfere by injunction to restrain the transfer to a *bona fide* holder of an obligation held by the courts of that state to be invalid in the hands of such a holder, and this although such transferee might resort to the federal courts, where a different rule of law prevailed, and to which courts the present holder could not resort. *Town of Venice* v. *Woodruff, 62 N. Y. 462, 468 (1875).* Justice Rapallo said: "The real purpose of the litigation seems to be to prevent a resort to the courts of the United States for the collection of these bonds, and the question is whether it is the province of a court of equity in a state to interfere for the purpose of preventing a resort to the federal courts for the enforcement of obligations on the ground that they may be held in those courts to be valid, while according to the decisions of the state courts the same obligations are held to be void. I apprehend that the power of a court of equity to decree the surrender and cancellation of instruments has never before been appealed to or exercised for such a purpose."

As authority for the proposition that one court of equity may restrain an action pending in another court of equity, I am referred to *Erie Railroad Co.* v. *Ramsey, 45 N. Y. 637. (1871).* An examination of the case shows that it determined only the existence of the power, and not the propriety of its exercise under the circumstances presented. The case is a somewhat notorious one. The company had procured from Justice Barnard, of the supreme court, an injunction restraining Ramsey from proceeding further in an equitable action that he had previously brought in the same court against the company and certain of its directors. Ramsey, on advice of counsel, disobeyed the injunction on the ground that the court had no jurisdiction to stay his proceeding in another action in the same court.

Thus the question was raised whether he was guilty of contempt. The court of appeals held that he was. In the opinion

the action of Justice Barnard in issuing the injunction is excused on the ground that upon the case as presented to him, Ramsey was charged with a purpose to throw the vast property of the Erie Railroad Company into the hands of a receiver by fraudulent acts, including a fraudulent appearance for the company and a consent to the receivership by an attorney acting in collusion with Ramsey and without authority from the company. The opinion plainly intimates that Justice Barnard erred in not requiring that the application to stay proceedings be made in the action already pending The *decision* was simply that he acted within his jurisdiction, and that his injunction could not be ignored as void on its face. See citations, *126 N. Y. 494; 136 N. Y. 265.*

In *22 Cyc. 810,* the topic is treated as follows, with abundant citation of authorities:

"It is a general rule that a party will not be restrained by injunction from proceeding with a suit in equity, because complainant's equitable rights can be fully protected in that suit. An order to stay such suit should be obtained by an application in that court itself. It follows that equity will not enjoin a suit to obtain an injunction, or an accounting or a receiver. Nor will a foreclosure suit be enjoined for the relief of one who might obtain full relief in that suit itself. However, a court of equity has 'power' to enjoin a party from proceeding with other equitable suits, and such an injunction, when issued, is not void and must be obeyed. But the power should be exercised only in extreme cases. The court first acquiring jurisdiction of a case will protect that jurisdiction by enjoining an action by the same parties on the same subject-matter in another court, even though that other court may also have equity jurisdiction. Wherever complainant's rights cannot be fully protected in the other suit it will be enjoined. An injunction will be granted in actions of interpleader against the further prosecution of suits against complainant, even though one of these suits may be in equity, because of the necessity of disposing of the whole matter in one action. And where equity has undertaken to administer the assets of an insolvent corporation, so far as they are within its jurisdiction, other equitable suits for the same purpose will be enjoined. So a bill of peace lies to prevent a multiplicity of suits, even though the suits may themselves be in courts of equity."

My examination of the authorities convinces me that the reported instances of interference by courts of equity in *equitable actions already pending in other courts* are all based upon exceptional circumstances and may be classed within a very few

groups. Without assuming to enumerate all of these groups, I may mention the following principal ones:

*First.* In early times in England there was a controversy about jurisdiction between the chancery and the exchequer, the former holding that the latter was a sort of "private" court, its equitable as well as its legal jurisdiction being dependent upon the averment of *quo minus,* and resting upon the effect of defendant's act in disabling the plaintiff to respond to the crown, and that the chancery was a court of superior and more general jurisdiction. See *Joanes* v. *Whitney, Cary 161 (1578)* ; *21 Eng. Rep. 60* (but this was an injunction out of chancery to restrain an action *at law* brought in the exchequer *after* the commencement of the chancery suit) ; *Vendall* v. *Harvey, Nels. 19 (1632)* ; *21 Eng. Rep. 779; S. C., 1 Eq. Cas. Abr. 80 G. 2,* and *134 D. 3; 21 Eng. Rep. 893, 939,* where the lord keeper (North) overruled a plea that set up the pendency of a prior equitable action in the exchequer as a bar to a suit in chancery, on the ground that "the chancery was the *highest* court of equity, and though the exchequer was an ancient court of equity, yet the same was but a *private* court, and its jurisdiction properly was only for getting in the king's revenue, and for the king's officers, and they ought to keep within their proper bounds." And see *6 Vin. Abr. "Court of Exchequer," Q. 2 p. 569.*

*Second.* Interpleader suits are a recognized exception, and where a plaintiff is entitled to interplead defendants, and pays the money into court, other actions against them may be enjoined, whether these be legal or equitable. *Warington* v. *Wheatstone, Jac. 202 (1821)* ; *4 Eng. Ch. 203; 37 Eng. Rep. 826.* (Here one of the suits enjoined was legal, the other equitable. See *10 Sim. 480.*) So in *Crawford* v. *Fisher, 10 Sim. 479 (1840)* ; *59 Eng. Rep. 701; Richards* v. *Salter, 6 Johns. Ch. 445 (1822)* ; *Sieveking* v. *Behrens, 2 Myl. & C. 581, 592, 593 (1837)* ; *40 Eng. Rep. 761, 765; Prudential Assurance Co.* v. *Thomas, L. R. 3 Ch. App. 74 (1867)* ; *2 Story Eq. § 808.*

*Third.* Creditors' suits against executors or administrators for the administration of the estate, may be treated as an exception, where *after* (but not before) decree, an injunction has frequently been issued to restrain other proceedings by creditors at law or

in equity, the decree in the administration suit being considered to be in the nature of a judgment in favor of each and every creditor. *1 Story Eq.* § *549; 2 Id.* § *890; Jackson* v. *Leaf, 1 Jac. & W. 229, 231 (1820)* ; *37 Eng. Rep. 362; Beachamp* v. *Marquis of Huntley,* and *Clarke* v. *Earl of Ormonde,* reported together in *Jac. 546 (1822)* ; *37 Eng. Rep. 956; Carron Iron Co.* v. *Maclaren, 5 H. L. Cas. 416 (1855)* ; *10 Eng. Rep. 415,* cited more fully hereafter.

*Fourth.* Prevention of multiplicity of suits. On this ground suits in equity may no doubt be enjoined, *if necessary to do so,* as well as suits at law. Probably *Beckford* v. *Kemble, 1 Sim. & S. 7 (1822)* ; *57 Eng. Rep. 3,* belongs in this category; there Vice-Chancellor Leach stayed a foreclosure suit pending in the colonial court of chancery in Jamaica, until an account could be taken in a suit for redemption in England, all the parties being in England, so that the accounts could be more conveniently taken there than in Jamaica.

*Fifth.* Where a party by fraud attempts to produce an unjust result in a pending suit and consequent irreparable injury to his adversary, he may, of course, be enjoined. In this class lies the injunction granted by Justice Barnard in *Erie Railroad Co.* v. *Ramsey, 45 N. Y. 637,* the criticism being that he should have left the company to apply for a stay by motion in the suit already pending.

*Sixth.* Oppression amounting to fraud may be attempted by suing a debtor outside of his home jurisdiction, in order to gain an unconscionable advantage over him, in which case equity may restrain the creditor, upon proper terms. *Standard Roller Bearing Co.* v. *Crucible Steel Co., 71 N. J. Eq. (1 Buch.) 61,* decided by my predecessor, Chancellor Magie, was a case where both parties were corporations of the State of New Jersey. The defendant had a claim against the complainant of less than $4,000, and notwithstanding it might sue the complainant in the courts of this state, or prosecute its claim by attachment upon a valuable property of the complainant in Pennsylvania (in either case the claim could be prosecuted and defended by proofs and witnesses at hand), the defendant brought three attachment suits simultaneously in Ohio, Michigan and Wisconsin, wherein credits due

to the complainant to an amount exceeding $20,000 were garnished. The learned chancellor held that these attachment suits in distant states were oppressive, and that their prosecution should be enjoined, upon terms, however, that complainant would submit to a speedy trial of the claim in this state, and would give bond, with security, in a penal sum double the amount of the claim, conditioned for paying the amount ascertained to be due; ascertainment either to be made by this court or by any court of competent jurisdiction in this state, at the election of the defendant.

*Seventh.* Cases where a party oppresses his adversary by suing him in a foreign jurisdiction for the purpose of evading some established policy of the jurisdiction where the parties are domiciled.

Since complainant here relies upon certain decisions that, so far as they have any pertinency, belong in this category, they may well be examined at some length. In reading the opinions care should be exercised in distinguishing that part of the reasoning which merely establishes the *power* from that which indicates its *exercise* in given cases.

*Bushby* v. *Munday, Cloves & Cracroft, 5 Mad. 297 (1821); 56 Eng. Rep. 908.* Bushby had given to Munday as trustee for Cracroft a bond to secure a gambling debt, and Munday had assigned it to Cloves. The bond was given in England and was in English form, and was claimed to be void as a gambling debt under an act of parliament. Bushby was a Scotchman and proprietor of real estate in Scotland, but resident abroad. Cloves brought an action in the Scotch court upon the bond, and thereby secured a lien (equivalent to our lien by foreign attachment) upon Bushby's estates. The latter thereupon filed a bill in the English chancery for the purpose of having the bond delivered up to be canceled, and incidentally to restrain the prosecution of the action in Scotland. The grounds of the application for the injunction were that a bond was an English security, and a discharge from it abroad could not be pleaded in England; that the English chancery might require the bond to be delivered up, while in Scotland no such relief was given; in England discovery could be had by sworn answer of Munday and Cracroft,

31

whereas in Scotland such an answer would not be evidence, besides which it was urged that the invalidity of the bond arose out of an English act of parliament, not in force in Scotland. Vice-Chancellor Leach allowed an injunction upon terms, saying (*5 Mad. 308; 56 Eng. Rep. 913*) : "Mr. Bushby may succeed in his defence in Scotland and still be exposed to future proceedings upon the bond, but if he establish his case here the bond itself will be delivered up to be canceled, and he will be absolutely relieved from all future proceedings. This court is a more convenient jurisdiction for determining the question whether Cloves has by the law of England a right to recover upon the bond than the court of session in Scotland. The proceeding there is less likely to elicit the truth of the case than the proceeding here, because there Bushby cannot have the benefit of Munday's admissions upon his oath, and because Munday and Cracroft being both resident out of Scotland, he cannot compel their testimony as witnesses." The terms imposed were that Bushby should consent to judgment in Scotland so as to secure to Cloves a priority of lien upon the real estate, subject to the event of the suit in chancery. I deem it plain that the remark of Sir John Leach about the English chancery being "a more convenient jurisdiction" than the Scotch court for determining a question of English law, was not intended to indicate that the injunction was to be allowed on this ground, but merely to show that an injunction, allowed on the other grounds mentioned, would not work a hardship upon Cloves.

*Talleyrand* v. *Boulanger, 3 Ves. 447 (1797)* ; *30 Eng. Rep. 1099,* a personal bond was given when obligors and obligee were citizens and residents of France. By the law of France there was no liability to arrest on civil process for such an obligation. Afterwards the parties to the cause emigrated to England, and their property was confiscated. One of the plaintiffs was an obligor in this bond as surety, and, being about to sail on an expedition which went from England to the coast of Brittany, was arrested at suit of the defendant, and in order to procure his release made a cash payment and gave two bills of exchange payable in a short time, and executed a new bond payable six months after peace should be concluded between France and

England. At this time the other plaintiff first became a surety by joining in these securities. One of the bills of exchange having been paid, the plaintiffs, under advice of counsel, refused to make any more payments, and were thereupon arrested and held to bail by the defendant in four actions, whereupon a bill was filed for an injunction, and the lord chancellor (Lord Loughborough) granted it on the ground "that the proceeding on the part of the defendant has been extremely oppressive and immoral. I am not prepared to say how far this court will finally give redress, but I will not allow the defendant to avail himself of an advantage got by duress, which is the sole cause of the new engagement."

This case was manifestly decided upon the ground of apparent hardship, and in disregard of the rule that the *lex fori* governs actions for the enforcement of a contract although made in another jurisdiction. Like the case of *Melan* v. *Fitzjames, 1 Bos. & P. 138,* decided by the court of common pleas in the same year, it is a plainly erroneous decision, the outcome of the troublous times. Although Lord Brougham cited both these cases with apparent approval in the house of lords forty years later, yet the decision then made was to the effect that the law of the country where a contract is to be enforced must govern its enforcement. *Don* v. *Lippmann, 5 Cl. & F. 1, 18 (1837)* ; *7 Eng. Rep. 303, 309.* And in *Liverpool Marine Credit Co.* v. *Hunter, L. R. 3 Ch. App. 479, 486 (1868), Talleyrand* v. *Boulanger* was severely criticised. *Melan* v. *Fitzjames* was distinctly overruled and the doctrine of the dissenting opinion affirmed in *De La Vega* v. *Vianna, 1 Barn. & Ad. 284 (1830)*. And so, little, if anything, remains of authority in *Talleyrand* v. *Boulanger.*

*Lord Portarlington* v. *Soulby, 3 Myl. & K. 104 (1834)* ; *40 Eng. Rep. 40,* an injunction was allowed to restrain defendants from suing in Ireland upon a bill of exchange given by plaintiff for a gambling debt. The ground of the injunction, however, was that the court in which the action was brought was a *court of common law,* and had no jurisdiction to stop the proceeding on the ground that it was founded upon a gaming transaction.

*Carron Iron Co.* v. *Maclaren, 5 H. L. Cas. 416 (1855)* ; *10 Eng. Rep. 415,* rather bears against the complainant. The company

was a Scotch corporation, having its manufacturing works in Scotland and an important sales agency in London. A suit for administration of the estate of one Stainton, deceased, had been instituted in the English court of chancery, and a decree made for an accounting. Afterwards the company, a large creditor of the decedent, instituted an action in the Scotch court of session, in which process was issued (equivalent to our writ of attachment), securing a lien upon real and personal estate of the decedent in Scotland. An injunction was allowed to restrain this proceeding, but on appeal to the house of lords it was dissolved, on the ground that the company was a foreign creditor resident abroad, suing for his debt in the courts of his own country.

The following cases are typical of the group, and appear to be the principal authorities upon the question of enjoining foreign actions brought to evade the home policy.

In *Margarum* v. *Moon, 63 N. J. Eq. (18 Dick.) 586,* creditor and debtor were both citizens and residents of New Jersey, and the debtor under the laws of this state was entitled to $200 exemption from process, and had not personal property of that value. He had a claim for wages against the Pennsylvania Railroad Company, and his creditor assigned his claim against the debtor to a non-resident, who, in attachment proceedings in the courts of West Virginia, garnished the wages due to the debtor from the railroad company. This court allowed an injunction on the ground that the resident creditor was endeavoring to deprive his debtor of the benefit of the exemption provided by the law of their common domicile.

*Dehon* v. *Foster, 4 Allen 545 (1862, 1863)*; *7 Allen 57.* A resident of Massachusetts being insolvent under the laws of the commonwealth, and proceedings in insolvency having been commenced there, an injunction was allowed to restrain one of the creditors, who likewise was a citizen of Massachusetts, from proceeding by attachment in another state to divert property from the assignees in insolvency and thereby secure a preference for himself, contrary to the policy of the insolvent law of Massachusetts.

To the same effect is *Cunningham* v. *Butler, 142 Mass. 47.* This case was carried to the supreme court of the United States

upon the ground that such an injunction was a violation of the "full faith and credit" clause of the federal constitution. The decree was affirmed. *Cole* v. *Cunningham, 133 U. S. 107.*

*Wilson* v. *Joseph, 107 Ind. 490 (1886)* ; *8 N. E. Rep. 616.* Injunction granted to restrain a resident of Indiana from prosecuting an attachment proceeding against another resident in the courts of another state in violation of an Indiana statute which made it an offence to send a claim against a debtor out of the state for collection, in order to evade the local exemption laws.

*Sandage* v. *Studebaker Brothers' Co., 142 Ind. 148 (1895)* ; *41 N. E. Rep. 380,* held that a citizen of one state may be enjoined from prosecuting an action against another citizen of the same state in a foreign jurisdiction for the purpose of evading the laws of his own state.

*Miller* v. *Gittings, 85 Md. 601 (1897)* ; *37 Atl. Rep. 372.* The transactions out of which an alleged debt arose occurred in Maryland, and were within the statute prohibiting gambling; both parties were citizens and residents of that state. *Held,* that a court of equity in Maryland should restrain the creditor from proceeding against the debtor in another state to which the creditor had resorted to evade the Maryland laws prohibiting imprisonment for debt, where the foreign court must, through imperfect methods of proof, ascertain the statute on which the debtor relied to avoid the transactions, and where there must be difficulty and expense in obtaining evidence.

It will be observed that in all of these cases (with the single exception of *Bushby* v. *Munday,* where other special circumstances appeared) the party against whom the injunction was issued had either gone himself to a foreign jurisdiction, or had sent his claim there for prosecution by his assignee, in order to evade some distinct prohibition of the local law of the common domicile. (In most of them the suit whose prosecution was restrained was an action at law, but I assume that in such a case it would make no difference whether the foreign action was an action at law or an action in equity.)

But it is important to observe that the public policy, whose attempted evasion was deemed sufficient ground for injunction, was in each instance somewhat akin to a police regulation, being

designed to maintain a certain standard in the social, moral or commercial life of the state adopting it, such as a prohibition against gambling, against preferences in insolvency, against imprisoning the honest debtor or depriving him by civil process of the last comforts of life. There is, it seems to me, a noticeable difference between that sort of local policy and the alleged grounds of public policy that are asserted in the present case.

Besides, this case lacks two of the elements that were treated as essential in the cases just referred to; there was no common domicile of the parties in this state, and the defendant company did not choose the Massachusetts jurisdiction for the purpose of evading any law, policy or doctrine peculiarly cognizable by the courts of New Jersey, but for the very simple reason that Massachusetts had jurisdiction over the person of Mr. Bigelow, while this state had not.

Mr. Bigelow is sued *in personam* in his home jurisdiction, in equitable actions, and in a court of full equity jurisdiction; he tests the sense of that court upon the law by a demurrer, and being overruled he answers upon the merits, submits to a hearing upon the merits, a finding of facts is made, and upon it final decrees are made against him. The litigation in that court continues for more than five years. After all this, and pending appeals taken by him and by his adversary to the court of last resort, he comes into the State of New Jersey to have his adversary restrained from further prosecuting the actions in Massachusetts.

He proposes no waiver of his appeals there taken. He offers no security that he will abide by any decree that may be made against him, either here or there. He avers, it is true, that in the Massachusetts actions he "gave a surety bond or bonds, in the sum of $500,000, to indemnify the company," but there is nothing to show that such bonds could be enforced by this court, nor do the specific conditions thereof appear, besides which the amount of them is manifestly inadequate to cover the company's claims.

He alleges no fraud, mistake, surprise or adventitious circumstances beyond his control that prevent the Massachusetts court from doing full justice.

He alleges no suppression of evidence, no obstruction by the present defendant of any effort of his to get justice in Massachusetts.

And he alleges no excuse for failing to set up in the Massachusetts litigation the special matters that he here relies upon, nor for waiting until five years have gone by and a decision has been rendered against him there, before setting up his special matters here.

Ostensibly his appeal is to the public policy of New Jersey, in certain respects presently to be mentioned. But a large part of the efforts of his counsel have been addressed to convincing me that the supreme judicial court of Massachusetts and Justice Sheldon, the trial judge, have improperly determined the questions of law and of fact presented to them. The arguments to this effect are not in the least convincing, but if they were, I take it that I have no legitimate concern with the merits of the controversy as joined in Massachusetts. The notion is intolerable that this court should, directly or by indirection, assume any supervisory jurisdiction over the courts of Massachusetts.

Upon the questions of alleged state policy the query at once arises whether Mr. Bigelow, a citizen and resident of the commonwealth of Massachusetts, is entitled to invoke in his protection any rule of public policy that is local to New Jersey. See *Bentley* v. *Whittemore, 19 N. J. Eq. (4 C. E. Gr.) 462, 469, 470; Flagg* v. *Baldwin 38 N. J. Eq. (11 Stew.) 219, 225; Receiver of State Bank* v. *First National Bank, 34 N. J. Eq. (7 Stew.) 450, 454; Moore* v. *Bonnell, 31 N. J. Law (2 Vr.) 90; Barnett* v. *Kinney, 147 U. S. 476, 483.* I have not considered the point, preferring to rest my decision upon a broader ground.

The first grounds of supposed public policy that are appealed to are that the conduct of the suits in Massachusetts and in New York by the Old Dominion Copper Mining and Smelting Company is a speculation in a law suit, and that those suits are being conducted by what is called a "voting trust."

The argument to this effect is rested upon certain averments in the bill not as yet adverted to.

The bill alleges that since the Massachusetts actions were begun, the owners of about one hundred thousand out of the total

one hundred and fifty thousand shares of stock of the New Jersey company caused a Maine corporation to be formed, known as the Old Dominion Copper Company, and caused at first about one hundred thousand shares, and afterwards about forty thousand additional shares of the New Jersey company to be transferred to the Maine company, whereupon an agreement was entered into (as is alleged in the body of the present bill) between the New Jersey company and the Maine company and two men named Smith and Hoar, providing that the Maine company, as the majority shareholder of the New Jersey company, should cause the latter company to realize upon the suits against Bigelow and the Lewisohn estate, and distribute the proceeds thereof as in the agreement provided; that Smith and Hoar declared themselves to be trustees of any fund obtained by virtue of this agreement, and issued certificates of interest known as trust receipts, which are sold upon the public markets, the holders thereof not being in any substantial part the holders of shares of the Maine company or holders of shares of the New Jersey company. Complainant alleges that the holders of these trust receipts are the persons ultimately entitled to the moneys to be paid by the Maine company to Smith and Hoar as trustees, and that the prosecution of the suits in question is not being had for the purpose of benefiting the New Jersey company, but for the purpose of realizing the largest sum possible on the trust certificates; that the buying and selling of such certificates constitutes the trading in a law suit, and that the proceeds of any recovery in the actions will not go to any persons who were originally interested in the New Jersey company, nor so far as fourteen-fifteenths are concerned will they go to the New Jersey company, but will go to strangers to the transaction who have purchased the trust receipts.

Annexed to the bill, and by reference made a part of it, are a copy of the agreement referred to, and a copy of one of the trust receipts. Where these differ from the construction placed upon them in the bill, the documents themselves must of course control. It thus appears that the New Jersey company is not at all a party to these transactions. The agreement is dated January 15th, 1904, and is made between the Maine company, as a

stockholder in the New Jersey company, and Smith and Hoar as trustees. It pledges the Maine company to cause the New Jersey company to actively prosecute the claims against Bigelow and Lewisohn in such manner as the trustees may request, and upon like request to make settlement and adjustment of the claims; to cause the New Jersey company, if and so far as any moneys are realized from the claims, to pay the expenses of the litigation, including advances made by the trustees, and, after providing for certain other disbursements, to distribute the surplus as a dividend among its stockholders (that is, the stockholders of the New Jersey company), if it may lawfully do so, and if it cannot then lawfully make such dividend, to make the same as soon thereafter as legal impediment is removed. The Maine company agrees in other respects to use its reasonable efforts as a stockholder of the New Jersey company to carry out the agreement according to its true intent and purpose, and that if it ceases to be a majority stockholder in the New Jersey company it will make arrangements to bind the holders of a majority of the stock of the New Jersey company to carry out what the Maine company has by this agreement undertaken to do. The trust certificate simply certifies that the holder thereof is entitled to certain shares in the trust and to all the rights and benefits of a shareholder therein.

Plainly, therefore, what has happened is that after the present defendant company began its actions against Mr. Bigelow in Massachusetts, another company, a corporation of Maine, being the holder of a large majority of the stock of the present company, made an agreement with trustees by which they undertook to sell, or to place in form to be sold, any dividend that may hereafter be declared by the defendant to its stockholders out of the proceeds of the suits against Bigelow and the Lewisohn estate.

It is alleged in the bill that Mr. Bigelow is informed and believes that the voting power on the stock of the New Jersey company held by the Maine company has been (as to the matters referred to in the agreement between the Maine company and Smith and Hoar) transferred to Smith and Hoar, but this does not amount to an averment that such is the fact (even if the

fact were material), and nothing of that kind appears from the agreement.

To the argument of complainant's counsel, based upon the situation thus disclosed, there are several replies.

*First.* The trust agreement was made January 15th, 1904, more than four years before the filing of the bill of complaint herein, and nearly four years before the filing by Mr. Bigelow of his final answers in the Massachusetts suits; it is not suggested that his knowledge of this agreement and of the situation resulting therefrom is newly acquired, nor is any reason given why, if it is of any concern in the controversy between Bigelow and the New Jersey company, it should not have been set up and relied upon in the Massachusetts suits.

*Second.* The New Jersey company is not a party to the agreement, either in a legal or in an equitable sense.

*Third.* The agreement was made not only after the New Jersey company's cause of action against Bigelow and Lewisohn arose, but after suits thereon were commenced, and so cannot amount to a bar of the causes of action.

*Fourth.* Neither the law nor the policy of New Jersey prohibits what complainant is pleased to call a speculation in a law suit. In this state we have not adopted the English statutes of champerty and maintenance. *Schomp* v. *Schenck, 40 N. J. Law (11 Vr.) 195; Bouvier* v. *Baltimore, &c., Railway Co., 67 N. J. Law (38 Vr.) 281, 291.* And with us the assignment of choses in action has from an early day been encouraged. *Sullivan* v. *Visconti, 68 N. J. Law (39 Vr.) 543, 549; 69 N. J. Law (40 Vr.) 452.* An exception being the right of action for personal injuries. *Weller* v. *Jersey City, &c., Street Railway Co., 68 N. J. Eq. (2 Robb.) 659, 662.* Our law, therefore, would not prohibit the present defendant from thus assigning its right to recover from Bigelow and Lewisohn the moneys claimed to be due from them for breach of trust. And supposing this does not carry with it the right of individual stockholders to thus sell their anticipated participation in the moneys to be recovered, because such participation is contingent upon the declaration of a dividend out of the proceeds, yet in this state we recognize, in equity, assignments of contingent and expectant interests, pro-

vided they be made *bona fide* and for a valuable consideration. *Bacon* v. *Bonham, 33 N. J. Eq. (6 Stew.) 614; Terney* v. *Wilson, 45 N. J. Law (16 Vr.) 282, 285.* An attempted assignment of an allowance of alimony to be paid *in futuro* being an exception, based on special grounds. *Lynde* v. *Lynde, 64 N. J. Eq. (19 Dick.) 736, 750, 757.*

*Fifth.* In view of the non-adoption in this state of the laws against champerty and maintenance, and of the absence from our Corporation act of any prohibition, I am unaware of anything in the policy of this state to prevent stockholders from agreeing among themselves to aid the company in proper ways in its litigations against third parties, and to use their influence as stockholders to see that out of the proceeds of the litigation, if successful, the reasonable disbursements made by the stockholders in the company's behalf shall be refunded, and a special dividend made of the net proceeds if and when that can lawfully be done.

*Sixth.* But if the New Jersey company (the present defendant) were a party to the Smith and Hoar agreement, and if that agreement were contrary to public policy, I do not see how that benefits the present complainant. The proper result is that the agreement ought to be nullified, not that the company should go without remedy against a third party who defrauded it before the void agreement was made.

*Seventh.* If Mr. Bigelow desires to uphold the supposed public policy of New Jersey, in the respect that this agreement violates it, he can easily do so by paying to the New Jersey company what he owes to it, disregarding the claims of the holders of the trust certificates.

*Eighth.* There is nothing in the nature of a voting trust. Our Corporation act recognizes that corporate stock may be placed in pledge, and that pledgor and pledgee may agree between themselves as to how it shall be voted. *P. L. 1896 p. 290* § *37.*

I am referred to what I said in the court of errors and appeals (speaking for myself and one other judge) in *Warren* v. *Pim, 66 N. J. Eq. (21 Dick.) 353, 363,* upon the subject of voting

trusts, but (at *p. 380*) I spoke of the right to dividends, the substantial fruit of stock ownership as a property right and as a different thing from the right to vote as stockholder; of the one as being assignable separate from the stock itself, the other not.

The other matters of supposed public policy to which appeal is made by complainant have reference to the question of his liability, or the extent of his liability, to the defendant company.

In dealing with them it is important to first determine upon what basis of fact we are to proceed.

Notwithstanding the findings against him in Massachusetts, I concede that upon this motion, equivalent as it is to a demurrer to his bill of complaint, the complainant is entitled (saving laches or acquiescence) to have his account of the transactions, as given in his bill, treated as strictly true.

Now, this statement is to the effect that he was entirely blameless in his transactions with the company; that the property which he and his fellow-promoter made over to the company in exchange for $3,250,000 of its stock was in truth worth at least as much as that sum; that full disclosure was made to the owners of every share of the authorized capital stock, not only of the $1,000 that appears to have been actually issued and outstanding when the votes were taken, but also to all members of his syndicate who with him and Lewisohn received the distribution of $2,000,000 of the stock, and also to the owners of the remaining $500,000 of stock issued for working capital, because, as he says, he and Lewisohn themselves furnished this working capital and were entitled to this stock, and he says the syndicate members acquiesced in the withdrawal by himself and Lewisohn of the $1,250,000 worth of stock as a profit.

Taking all this as true, I am unable to perceive the least ground of appeal to this court, for on that basis of fact there is not only no matter of New Jersey state policy involved, but no ground of liability is suggested against him by the present defendant in its Massachusetts actions. What the company alleges and relies upon there is an entirely different state of facts. And complainant's counsel do not pretend that he is in any danger from the courts of Massachusetts if they accept his view of the facts.

And so we have Mr. Bigelow coming to New Jersey with this complaint:

"I am entirely free from blame in the transaction, but the defendant company, notwithstanding this, has sought me out in my home jurisdiction, brought actions against me there charging me with wrong-doing, and has actually proved a case against me to the satisfaction of the trial judge."

There being no suggestion that the Massachusetts court has not complete jurisdiction over his person or over the subject-matter, or that it lacks the power to do full and complete justice in the premises, nor that his adversary has obstructed him in the least about producing his evidence, Mr. Bigelow's plain remedy is to prosecute his appeal before the court of last resort of that commonwealth and procure a reversal of the findings that have been (unjustly, as he says) rendered against him.

There is neither reason nor authority for the interference of this court in the premises, if the facts be as complainant alleges them to be. The books, I believe, may be searched in vain for a case where a court of equity has enjoined a proceeding in another court of equity (perhaps I might say, or of common law), on the ground that the court in which the proceeding is pending has made, or may probably make, an erroneous determination of a mere matter of fact.

Perhaps the decision upon the topics remaining to be discussed might be rested here, and the bill dismissed because Mr. Bigelow's complaint is merely that the trial justice in Massachusetts has mistaken the facts and that there is danger the appellate tribunal there may make the like mistake, an inadmissible ground upon which to rest a prayer for injunction.

I will not, however, rest here, but will consider how Mr. Bigelow's case will stand if we assume Justice Sheldon's findings to be true.

Indeed, it seems to me that in a suit like the present, brought for the sole purpose of removing the controversy out of the Massachusetts jurisdiction and bringing it into this court for determination, on the ground that New Jersey is the exclusive forum for the settlement of the legal questions involved, Mr. Bigelow is now estopped from here setting up that the facts are

otherwise than as found by Justice Sheldon. The Massachusetts actions were commenced on October 7th, 1902; Mr. Bigelow filed his answers therein, setting up, or at least having the opportunity to set up, every matter of fact as to the transactions between him and the company that is alleged in his present bill. He submitted to a hearing upon the merits, and it is only after the court there has found the facts against him that he comes to this court, more than five years after the actions there were commenced, with a prayer that their further prosecution be restrained. It is, I think, inequitable to permit a litigant to thus speculate upon the outcome in a court that has full jurisdiction over the subject-matter and the parties, and when defeated there to go to another jurisdiction, praying that his adversary may be restrained. I will endeavor to show later the effect of this estoppel as to the legal questions now attempted to be raised by complainant. As to the matters of fact, the estoppel is, I think, especially clear. Mr. Bigelow has not merely delayed, he has acquiesced, has in effect ratified and confirmed (if need there were) the authority of Justice Sheldon to ascertain and determine the facts. He has had his "day in court," and the verdict is against him; his adversary, I think, is entitled to the benefit of that verdict. The appeals taken in Massachusetts do not alter this, for although the decrees are vacated, the findings of fact are not to be overruled on appeal unless they are without support in the evidence or are clearly contrary to the weight of evidence. The bill herein does not aver that the Sheldon findings are not fully sustained by the evidence, nor does it show what the evidence was.

The company could not bring Mr. Bigelow into a New Jersey court against his will. If he had "won the verdict" before Mr. Justice Sheldon, this court could not have set it aside. To allow him to here dispute the adverse findings puts the matter in this position: that the company must win *two concurring verdicts* in order to ultimately succeed, while he succeeds if he wins *either one of two*. Assuming the probability of success in a single trial to be equal as between the parties, Mr. Bigelow's plan would leave to his adversary one-half of one-half a "chance"

(or one "chance" out of four), and he would reserve all remaining "chances" (three out of four) for himself—a plain violation of that equality that is said to be synonymous with equity.

I will, therefore, discuss the arguments of complainant's counsel on the basis of the facts as found by Justice Sheldon, accepting these as true, not absolutely (for the bill avers a contrary state of facts), but *sub modo,* either (*a*) because with the facts as he asserts them there is no ground upon which this court can properly aid him, or (*b*) because he is estopped from denying the findings.

Justice Sheldon finds that there was no proper disclosure either to the company or to the stockholders thereof, aside from Bigelow and Lewisohn and their immediate agents and representatives; that $500,000 worth of stock was sold by the company (and not by Bigelow and Lewisohn) to the innocent public for working capital; that even the subscribers to Mr. Bigelow's syndicate were not made aware of the profit that he and Lewisohn were making out of the transaction above such as was shared in by the syndicate members themselves. He finds that the property for which one hundred thousand shares (par $2,-500,000) were issued was not worth in excess of $2,000,000 and that the property for which thirty thousand shares (par $750,-000) were issued was not worth in excess of $50,000; that Bigelow and Lewisohn were acting in a fiduciary capacity as promoters of the company, so that they owed to it the duty of full disclosure; that there was no disclosure; that they acquired all the shares in excess of the actual value of the property as a secret profit derived at the expense of their *cestui que trust;* that in the entire matter they acted in concert, each doing his part to carry out a general scheme for the advantage of both; that the control exercised by them over the company was a joint control, exercised by each for the benefit of both; that a proper disclosure of the facts by either would have frustrated the schemes of both; that the wrong complained of was the act of both, for which they must both be held responsible, both jointly and severally, and he therefore holds Mr. Bigelow liable for the entire loss to the company.

Upon this state of facts, what ground can properly be urged for an injunction out of this court to restrain the due prosecution of the pending Massachusetts action?

It is claimed that under New Jersey law Mr. Bigelow is not liable to the company for the amount ascertained by Justice Sheldon, nor for any amount. But certainly he would be liable as a promoter acting in a fiduciary capacity, if we take Justice Sheldon's findings as true. The liability of promoters is fully recognized in this state. *Plaquemines Tropical Fruit Co.* v. *Buck, 52 N. J. Eq.* (*7 Dick.*) *219, 230; Woodbury Heights Land Co.* v. *Loudenslager, 55 N. J. Eq.* (*10 Dick.*) *78; 58 N. J. Eq.* (*13 Dick.*) *556.* The decree in this case was affirmed as to liability and reversed only with respect to the amount chargeable against Loudenslager. *Arnold* v. *Searing, 73 N. J. Eq.* (*3 Buch.*) *262.* The case of *See* v. *Heppenheimer, 55 N. J. Eq.* (*10 Dick.*) *240; 56 N. J. Eq.* (*11 Dick.*) *453,* and *69 N. J. Eq.* (*3 Robb.*) *36,* was a receiver's action against stockholders for unpaid subscriptions, but the doctrine of promoter's liability entered into the decision.

But it is further argued that, conceding Messrs. Bigelow and Lewisohn are liable for the undisclosed profits, yet Bigelow is himself liable, according to New Jersey law, for no more than the profit that he personally realized in the transaction. This argument is rested upon the decision of our court of errors and appeals in the case of *Woodbury Heights Land Co.* v. *Loudenslager, 58 N. J. Eq.* (*13 Dick.*) *556,* reversing *S. C., 55 N. J. Eq.* (*10 Dick.*) *78.* In that case a Dr. Roe was concerned in selling land to the company at a profit to himself. Roe alone held the options and obtained for the company the title to the lands purchased, and received from it the purchase price. Loudenslager was a party solely because of his agreement with Roe that Roe should pay him half of the profit as a compensation. See the essential facts recited in the opinion of Mr. Justice Garrison, *58 N. J. Eq.* (*13 Dick.*) *559.* The suit was against Loudenslager alone, and this court held him liable to the company for Roe's profit as well as his own. The court of errors and appeals held that Loudenslager was not to be held beyond the profit that he himself made, Mr. Justice Garrison saying (at

*p. 561*) : "I am strongly impressed with the idea that the erroneous decree was reached because of two circumstances, neither of which should have had any influence upon the decision of the case. These are—*first,* the failure of the complainant to make Roe a party to the suit, whereby the entire complexion of the suit was confused, if not changed, and *second,* the circumstances that Loudenslager, *acting in an alien capacity,* manually received the purchase-money, whereas in fact and in equity he received only that moiety that under his agreement with Roe was his. That Loudenslager in this tradition of title was a mere conduit is not only found as a fact by the vice-chancellor, but that the complainant knew that it was dealing with Roe is also clearly established by the proofs."

Whether the evidence in that case would have justified the conclusion that Roe and Loudenslager were joint promoters, acting in concert in the acquisition of a common profit, which, by agreement, was divided between them, is a question with which I am not concerned. As I understand the decision of the court of errors and appeals, it rests upon the view that in fact Roe and Loudenslager stood in separate and distinct relations to the company, and that the profit which Roe derived passed through Loudenslager's hands, not in his capacity as trustee for the company, but "in an alien capacity." That the court took this view of the facts is, I think, further manifest from the reliance it placed upon the leading case of *Tyrrell* v. *Bank of London, 10 H. L. Cas. 26; 11 Eng. Rep. 934.* In that case one Read, as well as Tyrrell, was concerned in selling property to the bank at a profit. Tyrrell was solicitor for the bank, but Read, as held by the master of the rolls, was a stranger, and from this part of the decree there was no appeal. The house of lords held Tyrrell responsible only for the profit that he had gained from the sale of the property to the bank. The pith of the decision is, I think, expressed by Lord Cranworth on page 50 of the report, as follows: "Throughout the whole of the dealing and the negotiations for this purchase, Tyrrell represented to his clients, the company, that Read was the sole owner of this property. To that representation the respondents are entitled to hold him bound, and that being so, the only question is what was the sum

of money which actually came from their pockets or coffers to Read. For all that passed through Tyrrell in its progress from the respondents to Read, but which never came to Read's hands, but was retained by Tyrrell, was so much money which he fraudulently abstracted from his clients." This case, therefore, was not a case of joint trustees, and the question determined was merely the extent of the responsibility of a sole trustee.

If the court of errors and appeals in the *Loudenslager Case* had intended to declare that when trustees acting in combination, reap a common profit out of a fraudulent transaction with their *cestui que trust,* and then divide the profit between themselves in a proportion previously or subsequently agreed upon between them, each one is responsible to the injured party only for that which eventually came to him as his personal share, I think some attention would have been paid in the reasoning of the court to the numerous decisions which hold that if joint trustees be guilty of an intentional breach of trust, they are liable jointly and severally, and each one liable *in solido,* and that it is not necessary to bring them all into court as a condition precedent to relief.

But, finally, if I am wrong in my understanding of the decision of our court of last resort in the *Loudenslager Case,* if that decision means that where two joint trustees are jointly guilty of a breach of trust and together derive therefrom an illicit profit of $2,000,000 and then divide this between themselves, either one of them can in this jurisdiction be held answerable only for his own share of the profit, it still does not seem to me to be unconscionable for the party defrauded to insist, in an equitable action brought in the home jurisdiction of one of the guilty parties, that he is responsible for the entire loss. If the claim is unfounded in equity, it is for the court in which the action is brought to so decide.

At this point I may conveniently deal with certain questions raised by complainant's counsel, that while, in my view of the case, not necessary to be passed upon, yet have a tendency to confuse the issue unless set in a proper light.

*First.* It is contended that either upon the basis of Justice Sheldon's findings, or upon the averments of the bills in the

Massachusetts suits, the company was not damnified by the transactions in question. The bills there aver that the shares of the new company issued to the promoters in payment for the properties "were at the time of a fair market value of $25 each, and continued for a long time thereafter to be of such or greater value." This averment, however, is shown by the context to have been intended to demonstrate the profit made by the promoters out of the transactions with the company, and, taken in connection with the other averments of the Massachusetts bills respecting the value of the property made over by the promoters to the company, it ought not, I think, to be construed as meaning that the market value of the shares was fairly representative of the value of the property. At least, if I am wrong in this, it is not unconscionable for the company to insist in the Massachusetts litigation that the construction I suggest is the true construction, or that otherwise an amendment of the pleadings should be permitted. Justice Sheldon finds that the market value of the shares was fully as great as their par value, at the time they were received by the promoters and for a considerable time thereafter, but he distinctly finds that this market value was due mainly to the manipulation of the promoters, and so his statement cannot be taken as meaning that the property that passed to the company was worth as much as the stock that was issued for it, in the face of his express finding to the contrary on this point. His findings must be taken as a whole. He was dealing with the market value of the shares solely for the purpose of determining the actual profit that accrued to the promoters out of the undisclosed allotment of shares to them. Finding that they received the shares under such circumstances that they were not entitled to hold them as against the company, he naturally held that the sales made by them, although made at an enhanced value by reason of their own manipulation of the market, accrued to the benefit of the company and not of the promoters. Moreover, common experience tells us that the sale value of corporate shares in the market has only an indirect and sometimes a remote relation to the fair market value of the property that forms the assets of the corporation. It is easy to see, for instance, how when men of standing in the financial world

promote a company, make over to it mining properties, and cause the shares to be placed upon the market, the confidence of purchasers of the shares in the standing and good faith of the promoters may enter largely into the competition for the shares, and thus affect their market value.   Such purchasers may reasonably believe that the property was sold to the company by the promoters at a fair and open price.   They may reasonably rely upon the liability of promoters to refund to the company any secret profit taken.   If the promoters are solvent, this liability may stand in the minds of purchasers of the shares as an asset of the company to make good any deficiency in the value of the property, and if the secret and forbidden profit of the promoters were taken in the form of shares, the liability to refund would be precisely equivalent to the inflation of the shares.   So, likewise, the circumstance that the company was incorporated under the laws of New Jersey, which require in effect that the stock shall be represented by money or money's worth, may be deemed to have some effect upon the minds of purchasers of the shares. I do not mean to say that the individual buyer thinks these matters out in detail, but it is quite easy to see that they may have a general influence upon the market for shares.

*Second.* But even were the property that was made over to the company in fact fairly worth as much as the par of the shares issued against it, this would not be conclusive against the existence of a liability on the part of the promoters, for reasons that will presently appear.

*Third.* A very considerable part of the argument for complainant is addressed to a discussion of the law of promoter's liability as applied to the circumstances of this case, not, indeed, upon the basis of the correctness of Justice Sheldon's findings, but rather upon the supposition that Mr. Bigelow's account of the transactions is to be taken as true.   I do not feel that I am called upon to definitely pass upon the questions thus raised, nor to examine them any further than to determine whether there is any question at issue that is beyond the proper cognizance of the supreme judicial court of Massachusetts.   Even were I to reach the conclusion that the company's case against Mr. Bigelow is · unconscionable, yet if the questions raised are

merely questions of equity, free from any element of law pecu-
liar to New Jersey, of which Mr. Bigelow may not have the bene-
fit in the Massachusetts jurisdiction, I could not properly enter-
tain his bill. Much effort is expended by his counsel in the
endeavor to persuade me that the case turns upon the New Jer-
sey law of stockholder's liability for unpaid subscriptions, and
that this is a question exclusively for the cognizance of New
Jersey courts.

The extraordinary character of the arguments leads me to
speak about the law of promoter's liability to such extent as may
be necessary for explaining why I do not think the questions in
dispute are of such a character that the court of last resort in
the state where the controversy is now pending is unfit to be
trusted with their solution. I give my impressions upon the
topic without intending to be precise, but with sufficient accu-
racy, I trust, to show the ground of my decision upon the only
point that I decide.

The term "promoter" is a term not of law but of business.
A promoter is one who seeks opportunities for making advan-
tageous purchases and profitable investments in industrial or
other enterprises, who interests men of means in such a project
when found, organizes them into a corporation for the purpose of
"taking over" the project, and attends upon the newly-formed
company until it is fully launched in business. He may be stock-
holder, director, officer, or none of these. His services begin
before the company is formed, and ordinarily are not concluded
until some time after its formation. For what he does and for
what he spends in seeking out and bringing together property
or opportunity, on the one hand, and men with capital, on the
other, he is entitled to reasonable compensation and reimburse-
ment by the new company. But it so often happens that pro-
moters desire to make a profit exceeding mere compensation for
their time and legitimate expenses, that what they thus get from
the company has come to be called "promoter's profits." No
rule of law or of equity prohibits such profits, provided they be
allowed as the result of a fair agreement amongst all parties con-
cerned. But promoters quite often desire to take their profit
immediately upon the formation of the company, while, in a

practical sense, it is in the formative period, with directors and officers who are the mere employes and figureheads of the promoter. Equity recognizes that in such a state of affairs the company as a corporation cannot make a binding bargain with the promoter, because he, in his control of the directors, is acting as a fiduciary agent for the company, and is himself in that capacity making a bargain with himself in his individual capacity. Hence the rule that the burden of sustaining such a bargain is upon the promoter, and that it cannot stand unless he has seen to it that the company is equipped with an independent board of directors to represent the general body of shareholders as against the interest of the promoter himself and that full disclosure is made to such board. Or, if there be not an independent board, there must be unanimous consent of all the shareholders, given after full disclosure.

Fraud or misrepresentation is not required to be shown in order to disentitle the promoter to the secret profit.

Some courts take the practical view that the body of shareholders who are entitled to be consulted, and to whom disclosure should be made, comprises not only those who are nominally shareholders at the time, but all others who, in pursuance of the original scheme of the promoter, thereafter become shareholders. Thus, in *Arnold* v. *Searing, 73 N. J. Eq. (3 Buch.) 262,* Vice-Chancellor Leaming held that the subscribers to a syndicate organized for the purpose of taking stock in a new company to be formed were essentially of the body of stockholders entitled to be consulted, although the technical relation of stockholder in the company had not yet arisen. Other courts have sometimes taken the more technical view that the bargain for promoter's profit is well made if assented to by those who are strictly shareholders at the time.

Saving the question of overvaluation of the property, Messrs. Bigelow and Lewisohn would doubtless have been safe if they had received the assent of all the members of the syndicate to the profit, and if they had sold no stock to the public except under a plan of subscription that would have given to all purchasers fair notice of the circumstances, disclosing the profits that the promoters were making. Or, they might have waited

· for the profit until their fiduciary relation to the company had entirely ceased. Of course, if such measures as these are to be adopted, it may render difficult the feat of buying property for $1,000,000 and selling the same property shortly afterwards to the public for $3,000,000, but that is a different matter.

Where a promoter's profit is taken in the form of shares that represent no investment in money or in property, and exceed the reasonable services and legitimate expenses of the promoter, the shares are not deemed fully paid within the meaning of a statute that requires money or money's worth equivalent to the par value of the shares to be contributed by subscribers. And in such event the promoter who takes such shares by way of secret and undisclosed profit while he is acting in a fiduciary capacity to the company, while liable to refund the. shares or the proceeds of sale of them to the company on this account, will be also liable under the statute as for unpaid subscriptions. Of course, however, it is not a double liability. If he refunds the undisclosed profit, and thereby in effect satisfies his stock subscription, he cannot be held liable afterwards in an action upon the statute, and *vice versa.*

On the other hand, the promoter who takes shares as an undisclosed profit may be liable as promoter, but under no liability for unpaid stock subscription. This might happen if he sold property to the company for no more than it was worth, but sold it at a price higher than his fiduciary duty to the company permitted; that is to say, at a secret profit to himself.

In many cases, promoters in anticipation of the formation of the company themselves, buy property ·in order to make it over to the company upon formation. Whether the company in such cases is entitled to claim the benefit of the bargain made by the promoter is often a question of nicety, and may depend upon whether the promoter buys the property with his own money or with money that is in effect subscribed for the share capital. It may be thus in effect subscribed before the formation of the company, as is the case with many syndicates, in which event the promoter may be a trustee with respect to the property for the company thereafter to be formed, on the theory that the property was bought for the company.

Now, one of the fallacies, as I take it, of the argument for the complainant, lies in dealing with Messrs. Bigelow and Lewisohn, as if they themselves bought the stock of the Baltimore company and were entitled to do with it as they pleased. If it appears that they made the purchase with the money of the syndicate (and so Justice Sheldon finds), it is, I think, at least not unconscionable for the company to claim that the members of the syndicate were but prospective stockholders in the company, and that the company when formed was entitled to treat as a profit any value received by the promoters over and above what was paid for the Baltimore stock. I am aware that the supreme judicial court of Massachusetts, upon consideration of Mr. Bigelow's demurrer, said (*188 Mass. 321*) that Bigelow and Lewisohn were the absolute owners of the outside properties so far as the case was concerned, because the rights of the syndicate were not in question, and that the company was not entitled to the benefit of the purchase. That may have been because the bill in one place charged that the outside properties were acquired for the common benefit of Bigelow and Lewisohn, without mentioning the syndicate, and where mention was made of the syndicate it was not perhaps clearly shown that the members thereof were prospective members of the company. Justice Sheldon, however, evidently accepted the view expressed by the court on demurrer, for he did not give to the company the benefit of the purchase of the Baltimore stock, but, on the contrary, credited it to the promoters upon the basis of the *quantum valebat*. Whether he should have given them credit for the inflated value of the properties of the Baltimore company, which was caused, as he says, by "the skillful manipulation of Bigelow and Lewisohn and the ingenious manner in which they created a desire on the part of men interested to be allowed to join in the transaction," is another question. So it may be a question whether he should have allowed any credit for the value of the "outside properties," or should rather have treated them as a part of the value of the Baltimore stock. I have nothing to do with the merits of these questions, and am not expressing a definitive opinion about them; I am only endeavoring to de-

termine whether there is any question of law or equity involved
that is peculiar to New Jersey.

In the argument before me, stress was laid upon the fact
(averred in the bill) that the stock of the new company has been
sold in the market at $100 and even as high as $106 per share,
more than four times its par value.  These were recent sales,
made after the control of a large majority of the stock had been
acquired by the Maine company, and perhaps after the New
Jersey company had increased its capital and taken in additional
properties as above mentioned.  But supposing the stock from
the beginning had never sold at less than par, my view: is that it
does not at all follow from this that the company has not been
damnified by the subtraction of a secret promoter's profit.  Be-
cause an individual who buys shares at $25 per share, and after-
wards sells them out at that price or at a higher price, does not
individually sustain a loss, it does not follow that the company,
as company, has sustained no loss in the premises.  The error in
the reasoning, as I take it, arises from considering corporate
shares solely in respect of their secondary and derived function
as counters in a speculative game, rather than in their original
and legal significance as a right to permanently participate in
the business enterprises of the company.  In order to discover
whether the company has been damnified, it is safer to take the
case of the individual stockholder who becomes such at the be-
ginning and remains such until the expiration of the charter,
and who participates in the distribution of assets on dissolution.
Such a man would, of course, bear his share in the impairment
of the assets of the company.  The man who buys to sell again,
buys a property right, including a right to participate in all the
assets of the company, including its claims against faithless
trustees; when he sells, he passes that same right on to his
vendee.

It is, I think, erroneous to deal with the question of non-dis-
closure or of profits as if it affected only those stockholders who
did not know the facts.  The duty of faithfully executing the
trust is a duty owing to the *company;* the duty of disclosure
is owing to the *company.*  If there be a competent and inde-
pendent board of directors, disclosure to them is disclosure to

the company. But when the promoter stands on both sides of the bargain, by virtue of his control of the board of directors, there is in equity *no disclosure to the company,* and the profit cannot be retained unless there be unanimous consent of the shareholders. It is like any other irregular transaction affecting the interest of the company, which so far as not prohibited by law or not affecting the rights of creditors may be sanctioned by unanimous vote of all the stockholders. *Breslin* v. *Fries-Breslin Co., 70 N. J. Law (41 Vr.) 274, 282.* It is, as I take it, likewise erroneous to treat the non-assenting stockholders as if they were damnified in their individual capacity merely, rather than in their property rights. And equally erroneous to say that because no member of the syndicate and no original or subsequent stockholder is here complaining about any injury to their rights, the transaction is not open to question. Their successors in property interest are here in the form of the company; the former stockholders may have recouped their individual *damnum,* or even turned it to a profit, by selling out their stock in the market that Mr. Bigelow created. See the remarks of Lord-Justice James in the *Erlanger Case, L. R. 5 Ch. Div. 121, 122.*

So much for my impressions of the law of promoter's liability with respect to the questions raised in the present case. All I decide is that it is not a department of the law that is peculiar to New Jersey.

The doctrine of promoter's liability is not the creature of statute; it is "judge-made" law, in the sense that courts of equity everywhere, recognizing the obligations arising from the fiduciary relation, have applied to it the same principles of equity that obtain in all cases of trust. As stated by Lord Penzance in *Erlanger* v. *New Sombrero Phosphate Co., 3 App. Cas. 1218, 1230 (1878)* ; *6 Eng. Rul. Cas. 777, 788:* "The principles of equity to which I refer have been illustrated in a variety of relations, none of them, perhaps, precisely similar to that of the present parties, but all resting on the same basis, and one which is strictly applicable to the present case. The relations of principal and agent, trustee and *cestui que trust,* parent and child, guardian and ward, priest and penitent, all furnish instances in which the courts of equity have given protection and relief

against the pressure of unfair advantage resulting from the relation and mutual position of the parties, whether in matters of contract or gift." In this state the same general doctrine has been applied in every variety of confidential relation whether the *cestui que trust* be individual or corporation, as for instance, in the case of executors (*Marshall* v. *Carson, 38 N. J. Eq. (11 Stew.) 250, 252, 253*); director of a company (*Stewart* v. *Lehigh Valley Railroad Co., 38 N. J. Law (9 Vr.) 505, 522, 523; Marr* v. *Marr,* recently decided by our court of errors and appeals, *73 N. J. Eq. (3 Buch.) 643*); attorney and solicitor (see cases cited in *Lynde* v. *Lynde, 64 N. J. Eq. (19 Dick.) 749*); donor and donee, where a confidential relation exists (*Slack* v. *Rees, 66 N. J. Eq. (21 Dick.) 447, 449*).

No reported decision has been cited to me, and I have been unable to find any, holding that the liability of a promoter is to be determined by the law of the state where the corporation is created, rather than by the law of the state where the transaction occurred or where the action is tried.

But this entire discussion, as it seems to me, is aside from the question. It is all very well to say that the transactions between these parties ought to be governed by the law of New Jersey; a more pertinent question would be, by what law is Mr. Bigelow to be governed? Government acts *in personam,* and ordinarily *in invitum.* The real question in the case is whether the company has acted unconscionably in pursuing Mr. Bigelow in the courts of Massachusetts; that question is to be determined primarily by the conditions existing at the time its actions were commenced. It could subject him to process in the commonwealth of Massachusetts; it does not appear that it could have reached him elsewhere.

If New Jersey law is involved, it ought to have been, or ought now to be, set up in the Massachusetts actions.

It is said that the Massachusetts court is under no obligation to apply what it may conceive to be the public policy of another state. This may be admitted *arguendo,* and yet it should be presumed that the courts of Massachusetts would not in comity refuse to recognize the law or policy of another state. Certainly it comes with poor grace for a citizen of Massachusetts to say

that the highest court in his state will refuse to recognize the
law of a sister state, when he has preferred no request to the
court that it be recognized. It is argued, indeed, that it is im-
possible to introduce evidence in one state of what is the public
policy of another state; that in the absence of reported decision
it rests in the mind of the court. Our courts, however, have
repeatedly declared that the public policy of the state is not the
creature of the courts but of the legislature (*Dimick* v. *Metro-
politan Life Insurance Co., 69 N. J. Law (40 Vr.) 384*, and
many other cases); that the courts have nothing to do with
forming it, and can only recognize it like any other matter of
public law. The truth is, that the public policy of New Jersey
is not occult or mysterious, nor are its sources far to seek. Sub-
ject to the federal constitution and a written constitution of our
own, the people of this state have adopted in the main the com-
mon law and equity system of England, and this obtains here
subject to modification by the legislature. Add to these that
New Jersey expects all persons and corporations subject to her
jurisdiction to observe the law or abide by the consequences, and
we have the public policy of New Jersey in a nutshell.

Mr. Bigelow, in his answers in the Massachusetts actions, not
only raised no question of the applicability of New Jersey law
or policy, but on the contrary averred that

"the transactions, matters and contracts complained of in the plaintiff's
bill took place and were made in the State of New York, by the laws
whereof said transactions, matters and contracts are valid and cannot
be complained of."

Upon this issue, among others, he went to hearing and sub-
mitted his evidence to the trial justice, who found that the di-
rectors' meeting of July 11th, 1895 (which Bigelow claimed was
governed by the law of New York), was held in New York City,
and that the proposals were made and accepted there; that the
company was a New Jersey corporation, and was to have places
of business also in Arizona, New York and Massachusetts; that
it was the intention of the parties that the agreements should
be carried out and consummated by the delivery of the deeds
and the issue of certificates of stock in Boston, Massachusetts,

where it was intended that the offices of the company should be, and where they were established, and where in fact the agreements were so carried out; that it was intended that the business of the company, aside from actual mining and smelting operations, which were to be conducted in Arizona, should be carried on in Massachusetts, and that this was done. And he ruled, upon these findings, that the agreements in question were governed by the laws of Massachusetts.

Some of complainant's arguments proceed upon the theory that the Massachusetts actions are based upon the statutory liability for unpaid stock subscriptions, in which case, of course, the liability would be governed by the New Jersey statute. They are not of this character. If they were, the New Jersey law could be shown by proof there. Actions upon the stockholder's liability must perforce be brought where defendant resides or can be served with process. An instance in our own courts is *Grosse Isle Hotel Co.* v. *I'Anson, 42 N. J. Law (13 Vr.) 10; 43 N. J. Law (14 Vr.) 442.*

The fact that the promoters' share certificates were stamped "issued for property purchased" is not controlling in an action against a participant in an intentional inflation of capital, where there was no independent board of trustees and no *bona fide* appraisement of the property. *Donald* v. *American Smelting, &c., Co., 62 N. J. Eq. (17 Dick.) 729; Volney* v. *Nixon, 68 N. J. Eq. (2 Robb.) 605, 609; Easton National Bank* v. *American Brick and Tile Co., 70 N. J. Eq. (4 Robb.) 722, 728.*

It is contended that the general rule that a party seeking relief in the courts may choose his own forum, in any jurisdiction where the defendant may be found, does not extend to corporations; that these creatures of the law should pursue their rights according to the law of the state of their origin. This is a sufficiently startling proposition, and is, I believe, entirely novel; certainly no authority has been found for its support. It is conceded that there is no statutory prohibition, but it is seriously contended that the supposed limitation of liability laid down in the Loudenslager decision enters so deeply into the policy of this state that, to use the words of counsel, "New Jersey is bound to protect those organized under its corporation laws according

to the laws of the state." How the legitimate interests of those organized under the corporation laws of New Jersey are to be protected by forbidding to our corporations as ample a remedy against fraudulent promoters and trustees as the corporations of another state would have, or as individual citizens of this state if in like manner aggrieved would have, I confess I cannot understand. The principal object of our corporation laws is to endow organizations of men and capital incorporated thereunder with the capacity to do business in any part of the world in competition with natural persons and with corporations organized under other laws. For this purpose they require, of course, as ample remedies against their trustees for breach of trust as other persons and corporations would have in similar circumstances. The act under which the present defendant was incorporated (*Rev. 1877 p. 175 § 1*) conferred upon it, in terms, the right to sue and complain "in *any* court of law or equity."

The proposed limitation of this right would give to the wrongdoer, not to the party injured, the choice of jurisdictions, and the option would be exercised always to the disadvantage of the company. Delinquent trustees who happened, like Mr. Bigelow, to reside in a jurisdiction whose courts (upon the hypothesis) extend a more ample relief to the company than is extended by the courts of New Jersey, would come to this state for limitation of their responsibility, while those who, like the Lewisohn executors, happened to reside in a jurisdiction where the courts are (supposedly) more lenient to the delinquent trustees than the courts of New Jersey, would find sanctuary at home. If the proposed doctrine is to be applied to promoters, it must, I presume, be applied to other kinds of trustees who may defraud the company, and thus we should have the New Jersey corporation in a substantial measure left defenceless against its most dangerous enemies. And this novel doctrine is based upon what, after all, is but a fiction of the law—that a corporation organized under the laws of this state, although its actual business is carried on in other states, remains at all times a "resident" of New Jersey. The doctrine, it seems to me, is as unfounded in reason as it is unsupported by authority.

Nor do I find any greater merit in the argument that this court ought to intervene because the decisions of the federal courts in the *Lewisohn Case* are in conflict with the decision in Massachusetts in the Bigelow suits. This conflict, by the way, turns upon a point that apparently does not reach the merits, if we accept Justice Sheldon's findings as true. The conflicting decisions were upon demurrer in both cases. The pleader seems to have made a slip, in averring that the company, when incorporated July 8th, 1895, had an authorized capital of only $1,000, which was afterwards increased to $3,750,000, and in averring that the purchase by the new company of the properties in question, the taking possession thereof, and the delivery of deeds, were all consummated prior to July 18th, on which date it was resolved to issue the twenty thousand shares to the public for working capital. On this basis of facts the federal courts held that there was disclosure to all stockholders who were such at the consummation of the purchase, apparently referring to the holders of the original amount of $1,000 of stock, who were either the promoters themselves or their dummies. The Massachusetts court held that disclosure should have been made, and was not made, to the corporation as organized with a capital of $3,750,000. But the bill herein avers that the corporation was originally capitalized at $3,750,000, and Justice Sheldon's findings show that the purchase of the property was not consummated, nor the stock issued to the promoters, until after the sale of stock to the public for working capital; that the promoters' stock was issued to them on September 18th and 19th, 1895, the deeds delivered to the company in the following December or January, while the issuance of the twenty thousand shares to the public for working capital was done "in the summer or fall of 1895."

But even if the decisions in Massachusetts and in the federal courts were irreconcilably contradictory upon matters that are dispositive of the case, I cannot see how that raises the least equity for the complainant in this jurisdiction. It is not pretended that the courts of Massachusetts are, in such a controversy, subordinate to the federal courts, and if they were so, Mr. Bigelow's plain remedy would be to apply to the Massachusetts

courts or to the federal courts for relief in the premises. It is certainly a novel suggestion that the court of chancery of New Jersey should stretch forth its strong arm and require a litigant in Massachusetts to abandon his claim there, because in another action the supreme court of the United States has expressed a different view upon the matters in controversy.

Upon this point I approve of the decision in *Carson* v. *Dunham, 149 Mass. 52; 20 N. E. Rep. 312,* above cited.

But further, it is strenuously argued that Mr. Bigelow, if held liable to the defendant company *in solido,* is entitled to contribution from the estate of Lewisohn; that he will be barred of this right by the failure of the defendant to make good its action against Lewisohn in the federal courts, and that hence the Massachusetts actions should be enjoined and the company required to proceed in this court, with the Lewisohn executors joined as parties.

This argument strikes me as little less than absurd. Upon the face of it, the supposed bar is to arise not because defendant company is endeavoring to recover against Bigelow in Massachusetts, but because, notwithstanding its best endeavors, it seems liable to fail of recovery against the Lewisohn estate. How the company can be held responsible for this result I am at a loss to perceive. Certainly Mr. Bigelow has no apparent right to complain because of the non-success in the Lewisohn suit, for his bill does not allege that he made any offer to aid the company therein, and it is not to be presumed that his assistance would have been declined.

Mr. Bigelow does not join the Lewisohn executors as parties to the present bill, nor show how this court or any other court of this state can get jurisdiction over them, they residing in New York. The bill alleges that the estate of Lewisohn "owns a large amount of property within the State of New Jersey," but there is no averment of its value, nor suggestion that it is by any means adequate to secure even one-half of the moneys claimed by the company.

But besides, equity does not recognize any right of contribution between joint tort-feasors, the reason being that such contribution must be sought, if at all, by action brought by one

against the other, and the actor therein is barred by the maxim *in pari delicto. Pom. Eq. Jur.* § *1081,* and cases cited in notes.

And surely one of several wrong-doers will not be given a better right against the injured party than he has against his fellows, else what becomes of the doctrine of clean hands?

Conceding the general rule to be so, counsel insist that it does not apply to joint trustees who "have merely mistaken their legal rights and have not been guilty of intentional wrong-doing," and it is gravely argued that the fact that company promoters have derived a profit improperly from their dealings with the corporation "is not inconsistent with the supposition that they have acted in entire good faith."

Whether the latter remark can be true in any case of wrongful promoter's profit, I need not stop to consider, because it certainly cannot be true in Mr. Bigelow's case, upon the basis of Justice Sheldon's findings.

Accepting those findings as true, or at least as judicially established—and we must accept them, else the question of contribution is not raised—the case stands thus: Messrs. Bigelow and Lewisohn buy certain corporate stock for $1,000,000, with the very purpose of causing the property represented thereby "to be transferred to a new corporation, which they should procure to be organized with a much larger capital, for a much increased price." This property, the property of the Baltimore company,

"was not of the intrinsic value of more than $1,000,000. But its market value at the time of its transfer to the (new) company seems to have been greater than this, probably due in large part to the skillful manipulation of Bigelow and Lewisohn, and the ingenious manner in which they created a desire on the part of men interested in mines. as investors or speculators, to be allowed to join in the transaction they were carrying out."

They lead their associates in the syndicate—the men who unite with them in raising the $1,000,000—to believe that the new company is to have a capital of only $2,500,000, taking the property of the Baltimore company and the "outside properties" for $2,000,000 and raising $500,000 with the rest of its stock. In order to carry out their real scheme they make the nominal capital of the new company $3,750,000, sell $500,000 worth at par to

the innocent public, turn in the property for the balance of the
stock, account to the syndicate members for only $2,000,000 of
this, and retain $1,250,000 of it for their individual benefit, sub-
ject to the payment of legitimate expenses not exceeding $20,-
000. Mr. Bigelow

"did not act towards the members of his syndicate with the good faith
which they had a right to expect. * * * With a few individual ex-
ceptions he did not disclose the facts to them."

Thus Bigelow and Lewisohn get (in stock certificates made
out in manifest evasion of the New Jersey corporation law) an
undisclosed profit of at least $1,230,000. And then, in order to
convert their illicit gains into money, they proceed (or, at least,
Bigelow does) to unload their fraudulent stock upon the credu-
lous public. For the finding is that

"the stock which they thus took was then of fully its par value, this
being due mainly to the skillful conduct and manipulation of Bigelow
and Lewisohn, and continued to be so for some time, and until Bigelow
had sold out substantially all the stock that he took for his own use."

Stripped of all disguises, the transaction to be dealt with is
this: Of the entire authorized capital, $1,000,000 represents the
cost of the Baltimore property, $1,000,000 is "water," repre-
senting the manipulated increase in the value of that property
due to the stirring up, by Bigelow and Lewisohn, of a desire on
the part of investors and speculators to join them in their
scheme, and $1,250,000 (less $20,000 for legitimate expenses)
represents nothing more substantial than "wind." And this lat-
ter large block of stock the promoters proceed to sell to the un-
suspecting public, in a market manipulated by them, at fully its
par value. Besides this, they cause the company to sell $500,-
000 to the public for working capital.

When men who are implicitly trusted, by all persons con-
cerned, to fairly organize a new corporation and launch it upon
its business career, make use of their temporary control to lift
from its treasury, for their own use, upwards of a million dol-
lars, in par value, of its shares, without mentioning the circum-
stance to others, who in fact and in law are their business as-

sociates and *cestuis que trust,* it requires more hardihood than I possess to declare there is no intentional moral obliquity in the transaction. The moral obligation was perhaps more immediately and evidently owing to the syndicate members than to the purchasers of working-capital shares, but it existed equally in both cases.

But the taking of the secret profit in the form of shares was, of course, but the means to an end, the ultimate purpose being to get a fortune for nothing, and to get it at the expense of their fellow-men by selling these shares to the public as if they had honest value behind them (for they were stamped "Issued for property purchased," as the bill avers), when, according to Justice Sheldon's findings, they represented a deliberate and intentional overvaluation of the property. I do not speak of the sales of the promoter's stock to the public as the basis of their liability to refund the undisclosed profit to the company, except as those sales go to measure the amount of the liability; I speak now of the moral quality of their acts, the question of *intentional* wrongdoing, liability having been assumed as the hypothesis. Upon this question, the fraud upon the public is not to be ignored.

The only element of "mistake" that I can discern is that the promoters assumed that all this wrong could be made unassailable in law, if only they should cause "dummy" directors to go through the form of placing a fictitious valuation upon the property, whereas the law required real value. *P. L. 1889 p. 412 § 4; P. L. 1893 p. 444 § 2.*

I am unable to see how such a transaction could be accompanied with an honest belief on the part of the promoters that it was either lawful or right.

Besides, irrespective of wrongful intent, this plain violation of the letter and policy of our own Corporation act, done for the very purpose of acquiring the secret profit that is the basis of the liability to the company, debars either of the participants from resorting to the courts of New Jersey for assistance in recovering contribution from his fellow. In *Volney* v. *Nixon, 68 N. J. Eq. (2 Robb.) 605,* our court of last resort held that a contract between two persons that in exchange for their joint property one of them shall procure from a corporation of this state

an issue of stock to an amount known by all parties to be in excess of the value of the property, and shall divide the stock thus procured with the other person, is illegal, and the courts of this state will not aid in its enforcement, even though the objectionable feature has been accomplished by the actual issue of the stock. The principle of this decision was again affirmed by the same court in *Easton National Bank* v. *American Brick, &c., Co., 70 N. J. Eq. (4 Robb.) 722, 728.* If our courts will not lend their aid to the enforcement of a contract made for such a purpose by one of the parties against the other, they certainly will not lend aid to one of two promoters who jointly work a fraud upon the company, as well as a fraud upon the law, in order to accomplish a scheme for issuing stock of a New Jersey company having no value behind it. Still less will they aid the wrongdoer in his action against the company.

But, finally, this whole question of contribution, if there be any sort of question about it, belongs in the Massachusetts court, and Mr. Bigelow should apply there for his remedy. The company is already in court, and if equity requires that its actions be stayed, the Massachusetts court will, of course, stay them.

It is further argued that either the decision of the federal courts in the *Lewisohn Case,* if affirmed by the supreme court of the United States (and I assume the presumption was, when the present bill was filed, that there would be such affirmance, as in truth there has been), works an estoppel against the company (defendant herein) in favor of Mr. Bigelow, or else that this court should restrain the defendant from further proceeding in the Massachusetts court until a final decision is reached in the *Lewisohn Case* such as can be availed of by him as estoppel.

The argument made to show the alleged estoppel is elaborate, voluminous and ingenious. It is rested upon the circumstance that the so-called "outside properties" which were transferred to the new company in exchange for thirty thousand shares of its stock, were held in legal title by Lewisohn, but (as is argued) in trust for himself and Bigelow; that Lewisohn was authorized by Bigelow and the syndicate members to do what he did with the property; that the decision in the federal courts in favor of Lewisohn, the trustee, inures to the benefit of Bigelow as *cestui*

*que trust,* and since it has been determined in an action against him that the transfer to the company was not open to question by the company, it must necessarily follow that no part of the transaction as to which Bigelow was interested is open to like question by the company.

If I were called upon to pass upon the merits of this argument, I fear I should be constrained to declare it palpably unsound. The theory is that the actions brought by the company have to do only with the title to trust property; that the beneficiaries and parties ultimately entitled to the benefit of the property are not necessary parties; that the trustee represents the whole interest, and that the determination is binding upon the *cestui que trust.*

But the actions are *in personam,* to recover back property wrongfully acquired by the company's trustees from the company. The circumstance that so far as any consideration passed to the company in the exchange, it was conveyed to it by Lewisohn, acting as trustee for himself and Bigelow, is of no consequence, since they get credit for its value in the accounting.

And how Mr. Bigelow can escape personal responsibility to the company by a decision favorable to Lewisohn in the federal actions, when a decision against Lewisohn in those actions would have imposed no personal responsibility upon Mr. Bigelow, I confess I am unable to perceive.

But it is not for me to determine these questions. The whole controversy belongs in Massachusetts and not in New Jersey. If the decision in the federal courts is an estoppel it should be so alleged in the Massachusetts actions. If it is not as yet a complete estoppel, and equity requires that the company should stay its actions against Bigelow until the final determination of the Lewisohn suits, Mr. Bigelow's proper course is to apply to the Massachusetts court for a stay.

Mr. Bigelow's bill here cannot, in my judgment, be sustained upon a mere showing (if it were shown) that the cause of action asserted against him in Massachusetts is unconscionable, or that the company is estopped or for any other reason ought to be debarred from its action there. The supreme judicial court of Massachusetts is a court of conscience, and exists for the very

purpose of passing upon the question whether claims and defences are conscionable or unconscionable. In that court the controversy is pending, and to it Mr. Bigelow should make application for the relief that he asserts himself entitled to.

Various other points are raised in support of the bill. Some of them turn upon mere matters of practice or procedure. Others clearly are to be determined according to rules or principles of equity that are prevalent generally where courts of equitable jurisdiction are established, subject only to such variances as are inevitable between the courts of different states. With respect to each and every of them, so far as they may be well founded, complainant may readily obtain relief upon application to the original or appellate jurisdiction of the Massachusetts court. They require no special mention.

But, finally, it seems to me that the laches and acquiescence of Mr. Bigelow not only estop him in the respects already indicated, but that he is for the same reason foreclosed from practically every ground on which he invoked the jurisdiction of this court. As already mentioned, the Massachusetts actions were begun on October 7th, 1902. His final amended answers were filed as recently as November 6th, 1907. There is nothing to show that he was not then in full possession (or with reasonable diligence might have been) of every fact and of every suggestion of argument upon which he now relies. Upon this point I cannot do better than to quote from the brief of counsel for the defendant:

"If the law of New Jersey is the law by which the original merits of the case should be decided, this has been true since the beginning of the suits against Bigelow in 1902.

"If the pendency of the suits against Lewisohn has a bearing upon the suits against Bigelow, their pendency has been a fact since 1903.

"If the decisions in the Lewisohn suits have affected Bigelow's rights, the fact has been in existence since February 24th, 1905, and December 4th, 1906, respectively.

"If the conflict in the decisions on demurrer between the circuit court and the Massachusetts court is important, it has been so since June 19th, 1905.

"If there is a difference between the law of New Jersey and the law of Massachusetts, it has been apparent at least since June 19th, 1905.

"If a multiplicity of suits can be avoided by this proceeding in New Jersey, this has been true since 1902.

"If the agreement of the Maine company regarding the disposition of any dividends coming to it is of importance, the fact has existed since January, 1904.

"If the recovery against Bigelow in Massachusetts would be unconscionable in view of the foregoing things, this has been apparent since the respective dates."

It is argued by counsel for the complainant that mere delay, in the absence of detriment accruing therefrom, need not be deemed as a bar to an otherwise equitable claim. I do not think, however, that in such a case as is here presented any substantial detriment to the defendant need be shown. Mr. Bigelow has not merely delayed for a long and unreasonable time before raising the points that he now urges; he has, in the meantime, acquiesced in the jurisdiction of the Massachusetts court, and has sought to take a benefit from it in the form of a decree there that, if it had proved to be in his favor, would have been conclusive against the company. With full knowledge of the facts, he has deliberately consented to the jurisdiction of the Massachusetts court, has submitted his case to it upon the merits, and it is only after he is defeated upon the merits that he comes to this court for relief. In *Smith* v. *Colloty, 69 N. J. Law (40 Vr.) 365, 375,* it was declared by our court of errors and appeals that "the rule that defects in the form of process and the manner of its service are waived by making appearance and defence upon the merits is not a technical rule or a rule of mere practice or convenience; it is a rule of jurisprudence, grounded upon the fundamental idea that courts of justice exist for the purpose of hearing and conclusively determining disputes between litigants, from which it results that he who voluntarily comes (whether as plaintiff or defendant) before a court of competent jurisdiction over the subject-matter and there submits to a trial and determination of the merits of his controversy, is bound by the determination that he has thus invoked."

Nor was Mr. Bigelow's delay in coming here due to accident or inadvertence. Not only does his bill make no such pretence, but his counsel in their printed brief present his attitude as follows: "The complainant conceives that it was his duty to defend himself as best he might before the Massachusetts court, and thus, if possible, avoid any necessity for invoking the jurisdic-

tion of the court of chancery in New Jersey. This he did at much expense of both time and money, and it was not until the findings of the single justice in November, 1907, that the cases in Massachusetts reached a stage when it became apparent that this complainant's defences in Massachusetts would be unavailing and the situation presented the equities upon which this application is based and the necessity for invoking the aid of this court." Since he could not be brought to New Jersey *in invitum,* his attitude, frankly avowed, is that he reserved to himself two chances of gaining the better of his adversary, whereas his adversary was to have but one. The company must succeed in two litigations before it could enforce restitution if its right thereto was proved, while he was to be ultimately successful if he could succeed in winning either one of two litigations. His position is plainly that of one who speculates in the outcome in the court of original jurisdiction before going into another jurisdiction to have the original action restrained. Even if there were substance in the points that he raises here, I do not see how at this late date he could, under the circumstances, equitably ask for any consideration of them at the hands of this court.

Having considered with patience the voluminous arguments, my conclusions upon the whole matter are:

*First.* That the controversy between the parties is properly cognizable in the Massachusetts court, where prior actions are already pending.

*Secondly.* That the substantial controversy is about matters of fact, and not of law or of equity.

*Thirdly.* That so far as controversy exists about questions of law or of equity, they are questions that are within the cognizance of the Massachusetts court.

*Fourthly.* That the bill herein does not show that the defendant is acting unconscionably in prosecuting the Massachusetts actions, and therefore complainant is not entitled to have them enjoined.

*Fifthly.* That the complainant, by laches, acquiescence and waiver, has lost any right he might otherwise have had to invoke the jurisdiction of this court in the premises.

These matters appearing plainly upon the face of the bill, the motion for its dismissal will be granted, with costs.